RAYMOND MAGNON AND VERA E. MAGNON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

MAGNON SERVICE ELECTRIC CORPORATION, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4204–77, 4281–77.     Filed February 28, 1980.

*Paul M. Shimoff*, for the petitioners.
*John O. Kent*, for the respondent.

QUEALY, *Judge:* The respondent determined the following deficiencies in income taxes and additions to the tax in these consolidated cases:

*Raymond and Vera E. Magnon—Docket No. 4204-77*

| Calendar year | Deficiencies in income tax | Addition to tax sec. 6651(a)[1] | Addition to tax sec.6653(a) |
|---|---|---|---|
| 1970 | $80,818 | 0 | $4,041 |
| 1971 | 61,376 | $15,344 | 3,069 |
| 1972 | 48,778 | 0 | 2,439 |
| 1973 | 260,202 | 0 | 13,010 |

*Magnon Service Electric Corp.—Docket No. 4281-77*

| FYE Apr. 30— | Deficiency in income tax | Addition to tax sec. 6653(a) |
|---|---|---|
| 1970 | $103,575.85 | 0 |
| 1971 | 88,456.84 | $4,422.84 |
| 1973 | 16,187.47 | 809.37 |

Raymond and Vera E. Magnon, petitioners in docket No. 4204-77, were the owners of all the outstanding shares of stock of both Magnon Service Electric Corp. (hereinafter referred to as Magnon Service) and Del Mar Service Electric Corp. (hereinafter referred to as Del Mar).

Due to concessions made by the parties, the issues remaining for our decision are:

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

*Raymond Magnon and Vera E. Magnon—*
*Docket No. 4204-77*

(1) Whether petitioners received constructive dividends from Magnon Service for work completed on their personal property during 1970 in the amount of $109,811.38 and during 1971 in the amount of $82,386.09;

(2) Whether petitioners received a constructive dividend from Magnon Service during 1973 in the amount of $337,300 due to Magnon Service's forgiveness of Del Mar's indebtedness;

(3) Whether petitioners are liable for the negligence penalty under section 6653(a) due to their underpayment of taxes during the taxable years 1970 through 1973;

(4) Whether petitioners are liable for an addition to tax under section 6651(a) due to their failure to timely file their 1971 income tax return.

*Magnon Service Electric Corp.—Docket No. 4281-77*

(1) Whether petitioner's expenditures incurred in completing jobs on property belonging to Raymond and Vera E. Magnon, in the total amount of $192,197.47, are deductible as ordinary and necessary business expenses;

(2) Whether petitioner is entitled to a bad debt deduction for "uncollectible job cost advances" which it made to Del Mar in the amount of $337,300 for the year ended April 30, 1973;

(3) Whether petitioner is entitled to a deduction under section 162 for subcontractor expenses of Del Mar in the amount of $251,635.57 for the year ended April 30, 1974;

(4) Whether the petitioner could properly follow the cash method of accounting in reporting income and expenses from construction contracts; and

(5) Whether petitioner is liable for the negligence penalty under section 6653(a) due to its underpayment of taxes for the years ended April 30, 1971, and April 30, 1973.

## FINDINGS OF FACT

Some of the facts have been stipulated by the parties. Such stipulation and the exhibits attached thereto are incorporated herein by this reference.

Petitioners in docket No. 4204-77 are Raymond Magnon (hereinafter referred to as Magnon) and his wife, Vera. They

filed their joint Federal income tax returns for the taxable years ended December 31, 1970, through December 31, 1973, inclusive, with the District Director of Internal Revenue for the District of Los Angeles, Calif. All of the returns were timely filed except the return for 1971, which was filed late. Petitioners' legal residence at the time of the filing of the petition herein was Riverside, Calif.

Magnon Service, petitioner in docket No. 4281–77, is a corporation organized in 1968 under the laws of the State of California. It timely filed its corporate income tax returns for each of the taxable years ended April 30, 1970, April 30, 1971, and April 30, 1973, with the District Director of Internal Revenue for the District of Los Angeles, Calif. At the time of the filing of the petition herein, Magnon Service's principal office was located in Riverside, Calif., and its principal place of business was the southern California area.

After working as a journeyman electrician and an electrical contractor in the 1950's, Magnon established a sole proprietorship in 1961 to engage in electrical contracting. Magnon continued to do electrical contracting in the proprietorship form until August 12, 1968, when he transferred all of the assets of the business to Magnon Service, of which he was president and coowner with his wife, Vera, of all of the outstanding stock. Since that time, Magnon Service has been continuously engaged in electrical contracting work, and has primarily done subcontracting work on new commercial and industrial buildings located in southern California.

By 1970, Magnon Service did most of its subcontracting work for E. W. Hahn (hereinafter referred to as Hahn), a large general contractor and developer of commercial and industrial buildings which did contracting work in both southern and northern California. At that time, Magnon Service's work for Hahn accounted for 60 to 70 percent of its business. Hahn's subcontractor in northern California was Del Mar Electric, a corporation with which Magnon and Magnon Service had no prior affiliation.

Due to problems which Hahn was having in completing its jobs with its electrical contractors in northern California, Hahn wanted Magnon Service to do its subcontracting work in northern California. As a consequence, Hahn sent one of its officers to arrange a meeting between Magnon and the owner of

Del Mar Electric so that they could discuss getting together and forming a company to provide Hahn with a reliable electrical contractor in northern California. This meeting resulted in the formation of Del Mar on September 25, 1970, with Magnon as its president and coowner with his wife, Vera, of all its outstanding shares of stock and with the prior owner of Del Mar Electric as one of its employees. Del Mar was located in Fremont, Calif., and its principal business was electrical contracting on commercial and industrial buildings in central and northern California. Since Magnon and his wife were the sole shareholders of both Magnon Service and Del Mar, a brother-sister relationship existed between the two corporations.

The decision by Magnon to form Del Mar was based on his desire to maintain a good relationship with Hahn, Magnon Service's largest customer, and to prevent any potential adverse impact on Magnon Service if Hahn continued to have trouble completing its northern California jobs. Del Mar's formation also placed Magnon Service in a better bargaining position for obtaining jobs with Hahn since Hahn then allowed it to obtain jobs through informal negotiations rather than through the normal bidding process, which would have placed it in direct competition with other electrical contractors.

Del Mar's formation also helped Magnon Service improve its bargaining position with several other general contractors in southern California. Prior to its sister corporation's formation in 1970, Magnon Service's work in northern California accounted for only 1 to 3 percent of its total gross receipts for that period. After Del Mar's formation, Magnon Service received new business when it obtained contracts with two or three general contractors in southern California for jobs to be performed in northern California. Magnon Service was now able to undertake such jobs on a more profitable basis since it could hire Del Mar as its subcontractor to perform the work while it remained primarily liable to the general contractors.

Whenever one corporation performed work for the other, it billed the other for its services; and Magnon Service maintained records of the moneys due between the two corporations. Profits and losses from Magnon Service jobs, which were performed by Del Mar, and from Del Mar jobs, which were performed by Magnon Service, were split equally between the two corporations. Thus, by receiving a share of the profits from both its own

and Del Mar's jobs, and by billing its costs on Del Mar jobs to Del Mar, Magnon Service was able to increase its service to several general contractors in southern California, as well as to Hahn.

The brother-sister corporate structure also helped both Magnon Service's and Del Mar's businesses by allowing them to get larger performance bonds which some contractors required on jobs in order to guarantee that the work would be done as specified. The bonding companies that the corporations dealt with required both corporations and Magnon himself to execute such guarantees and assume liability on the bonds for any job of either corporation. By combining the assets of both corporations for bonding purposes, both corporations were able to secure larger bonds which, in turn, allowed them to undertake larger projects than either of them could have obtained in their individual bonding capacities.

The close affiliation between Magnon Service and Del Mar also enabled both corporations to borrow more funds than either could have borrowed by itself. At the time of Del Mar's formation, Magnon made a capital contribution to Del Mar in the amount of $25,000. Until Del Mar and Magnon Service could set up a joint line of credit to borrow funds from the Bank of America, Del Mar borrowed its operating funds from Magnon Service. In 1970, the two corporations made an account receivable financing agreement with the Bank of America which provided them with a joint line of credit equal to the lesser of $600,000 or 75 percent of certain accounts receivable pledged as collateral for loans from the Bank of America. Due to this joint banking arrangement, both Magnon Service and Del Mar could obtain larger loans than either one could obtain individually.

Besides being president and sole shareholder with his wife of the two corporations, Magnon had several separate developments which he conducted either by himself or with partners. Magnon owned several parcels of real property, and, as a personal investment, he constructed buildings on such properties during 1970 and 1971. In order to complete the buildings being constructed on his land, Magnon made an agreement[2] with

---

[2]The terms of the agreement between Magnon and Magnon Service, although not evidenced by a formal contract, are adequately set forth in the record in Magnon Service's corporate minutes for Dec. 7, 1970, as follows:

"any and all projects, buildings, or other assets built by this Corporation on behalf of its President

Magnon Service on December 7, 1970, to have it do the electrical contracting work on the structures. Pursuant to this agreement, Magnon Service provided materials and performed work on Magnon's properties in the following amounts:

| Property belonging to Magnon | Year ended Dec. 31, 1970 | Year ended Dec. 31, 1971 | Total |
|---|---|---|---|
| Airport hangar | $5,644.40 | 0 | $5,644.40 |
| Indiana property | 2,767.30 | 64,521.01 | 67,288.31 |
| Rubidoux complex | 71,088.77 | 17,865.08 | 88,953.85 |
| Swiss-Colony Cerritos | 30,310.91 | 0 | 30,310.91 |
| Total | 109,811.38 | 82,386.09 | [3]192,197.47 |

On all of these jobs, Magnon acted as a general contractor and personally supervised Magnon Service's work. Under the agreement, Magnon was obligated to pay Magnon Service's overhead and direct construction costs on work done for him. Thus, since Magnon Service did not have to bid for Magnon jobs or provide supervision on such jobs, its overhead costs on such jobs were lower than usual. Accordingly, the agreement specified that Magnon was to pay 105 percent of Magnon Service's costs in performing his jobs.

Magnon Service employed a bookkeeper who kept records of the work which it did for Magnon until late in 1971. On Magnon Service's books, however, the $192,197.47 which was spent on Magnon projects appeared only in its subsidiary job cost ledgers, without a notation that the amount was due from anyone or carried interest, and without corresponding entries transferring the amount to the general ledger or to an account receivable from Magnon.

These discrepancies were first detected by George A. Arzoo, a certified public accountant retained by Magnon, during his audit of Magnon Service's books in 1971. Since the respondent had not completed an audit which it was conducting of Magnon Service's books when Arzoo made his discovery, Arzoo was unable to correct such omissions by amending the corporation's returns for prior years to include such amounts in the corporation's income. After Arzoo "informed" respondent's agent of these omissions

---

shall be sold to him from time to time for cash and notes at a price equal to 105% of the costs incurred by this corporation * * * [and] that upon completion, Raymond Magnon shall pay to the Corporation in cash or notes 105% of said construction costs."

[3]This figure does not include the cost of additional work which the parties stipulated that Magnon Service performed for Magnon, since such amounts are not in dispute.

by turning over his workpapers to him, however, he reconciled the subsidiary and general job cost ledgers on the corporation's books and financial statement dated April 30, 1972, by debiting the $192,197.47 owed by Magnon to a non-interest-bearing account receivable and crediting that amount to retained earnings from prior years. Arzoo did not enter any of this sum in the corporation's interest-bearing account for loans receivable from Magnon, and Magnon Service did not issue any notes or similar instruments of indebtedness to Magnon with respect to this amount owing.

Although Magnon Service performed work for Magnon valued at $192,197.47 during the years ended December 31, 1970, and December 31, 1971, Magnon made no repayments of this amount during these years as such costs were incurred. Magnon did make payments to Magnon Service from September of 1972 until April 30, 1978, at which time the corporation's account receivable from Magnon showed a zero balance. However, the record is unclear as to how and when this amount was repaid. The corporation's financial statement for the year ended April 30, 1972, showed a total balance of accounts receivable owing from Magnon of $721,716, which included the sum here in dispute. On the corporation's general ledger for accounts receivable from Magnon, Magnon's payments on this total balance owing were listed only as credit amounts without descriptions allocating each payment to a specific job and stating the source of each payment.

Magnon Service deducted all of its $192,197.47 of job costs spent on Magnon projects as ordinary and necessary business expenses on its tax return for the year ended April 30, 1971. On its corporate income tax return for the year ended April 30, 1972, Magnon Service included this amount only as part of an adjustment which it made increasing yearend retained earnings to reflect "income from construction" allocable to prior years.

Neither Magnon Service nor Magnon has submitted any proof with respect to the amount of the corporation's earnings and profits available for distribution as a taxable dividend when the work was performed for Magnon.

Respondent asserted deficiencies against Magnon and his wife contending that they received constructive dividends for the work completed by Magnon Service on their property in the amount of $109,811.38 in 1970 and $82,386.09 in 1971. Consistent

with his position that Magnon and his wife received constructive dividends, respondent also asserted deficiencies against Magnon Service in 1971 disallowing its deduction of such amounts as business expenses and including such amounts in its income.

From September 30, 1970, until April 30, 1973, Magnon Service advanced funds and performed jobs on behalf of Del Mar, and Del Mar made repayments on such advances with cash and jobs that it performed for Magnon Service. Magnon Service made such advances in order to (1) help Del Mar pay its bills before it could obtain its own line of credit with a bank; and (2) help it complete its jobs in northern California, especially those jobs which involved Hahn. All intercorporate transfers of funds between Magnon Service and Del Mar were recorded in Magnon Service's general ledger account for "Receivables Due From Del Mar" as numerical charges and credits with few corresponding entries describing the reason for an advance or the source of a repayment. By April 30, 1973, Magnon Service's total advances to Del Mar exceeded Del Mar's total repayments to it by at least $337,300.[4]

In January or February of 1973, Magnon decided that the $337,300 debt owed by Del Mar to Magnon Service had become worthless. Accordingly, on separate corporate income tax returns for the year ended April 30, 1973, Magnon Service deducted the $337,300 then due from Del Mar as a bad debt attributable to uncollectible job costs; and Del Mar reported the same amount as additional income due to having its debts paid by its guarantor.

After its formation in September of 1970, Del Mar had persistent financial problems which ultimately caused it to file for bankruptcy on May 8, 1974. On its income tax returns, Del Mar reported profits and losses as follows:

| Year ended Apr. 30— | Profit (loss) |
| --- | --- |
| 1971 | $32,686.13 |
| 1972 | (69,957.00) |
| 1973 | (519,234.00) |

On October 1, 1972, Del Mar and Magnon Service sold selected

---

[4] It is unclear, however, whether Del Mar repaid the amounts in excess of the $337,300 still owing, since there was no evidence of the content of several adjusting journal entries to the account for receivables due from Del Mar which were made on Apr. 30, 1973, and which had reduced Del Mar's balance owing to Magnon Service to zero.

physical assets and their jobs in progress to Morrow-Meadows corporation, one of their major competitors. After the sale, Del Mar held only minor inventory and a few receivables. Pursuant to the contract of sale, Del Mar and Magnon Service agreed to pay Morrow-Meadows for costs it incurred in completing jobs for both of them, plus 9-percent overhead; and Morrow-Meadows agreed to pay each of them a percentage of its profits on completed jobs which was based upon each corporation's contribution of costs to the total cost of a job. Although Del Mar expected to profit from this sale, it suffered losses when Morrow-Meadows billed Magnon Service for the excess costs which it had incurred in completing Del Mar jobs at a loss.

By February of 1973, Magnon concluded that there was no prospect under the contract of Del Mar's making any profits with which to repay its debts to Magnon Service. The contract did provide, however, that as for tangible physical assets of both corporations which were selected by Morrow-Meadows, a purchase price could be determined by the parties as late as December 31, 1973, and would be payable between November 1, 1973, and December 31, 1973. While Magnon Service deducted the $337,300 due from Del Mar in 1973, Del Mar did not even file its petition for bankruptcy until May 8, 1974. Moreover, Del Mar was not in fact determined to be bankrupt until April 22, 1975.

Respondent asserted a deficiency against Magnon and his wife in 1973 contending that they received a constructive dividend due to Magnon Service's forgiveness of Del Mar's $337,300 debt. In the event that constructive dividend treatment is denied, respondent concedes that the advances were bona fide loans, but he asserts that Magnon Service's deduction of this amount as a bad debt in 1973 was, nevertheless, premature, since the debt did not become worthless until the filing of the bankruptcy petition on May 8, 1974.

With respect to its contract with Del Mar and Morrow-Meadows, Magnon Service next claims to have incurred deductible expenditures in the amount of $251,635.57 in order to reimburse Morrow-Meadows for its own excess costs in completing Del Mar jobs. The contract with Morrow-Meadows provided in pertinent part:

Morrow-Meadows agrees to undertake the completion for MAGNON [Magnon Service and Del Mar are collectively and individually referred to as MAGNON throughout the contract] of all its uncompleted contracts and jobs

in process * * * , and MAGNON agrees to compensate Morrow-Meadows * * * for its costs plus 9% thereof for overhead * * *

Attached to the agreement was a schedule of the jobs in progress which were transferred by Del Mar and Magnon Service.

On October 31, 1973, Morrow-Meadows billed Magnon Service for $251,635.57 of costs which it had incurred in completing Del Mar jobs. Such billings covered all Del Mar jobs which were listed on the schedule of jobs in progress attached to the contract and two Del Mar jobs which were not so listed. At that time, however, Magnon Service did not repay Morrow-Meadows for its losses incurred in completing Del Mar jobs. To recover such losses, as well as losses on Magnon Service jobs, Morrow-Meadows brought suit against Magnon Service, Del Mar, and Magnon.

On January 20, 1977, a stipulated judgment was entered in that suit under which only Magnon Service and Magnon were obligated to reimburse Morrow-Meadows with cash and trust deeds for losses in the amount of $350,000. This judgment was subsequently satisfied, except for $20,000, by a transfer of assets in the amount of $350,000 sometime during 1977. Apparently, the $251,635.57 in issue was fully repaid by this transfer of assets. The record indicates that most of these assets came from Magnon Service and were transfers by way of various deeds of trust. Although Magnon and his wife issued trust deeds in their names in partial satisfaction of the $350,000 owing, they failed to establish the amount of any such deeds. Moreover, by the time of the trial in this case, neither Magnon nor Magnon Service had shown that it made any cash payments pursuant to the judgment.

On its corporate income tax return for the year ended April 30, 1974, Magnon Service deducted $251,635.57 under section 162 contending that it paid this amount to reimburse Morrow-Meadows for losses incurred in completing Del Mar jobs. Respondent has disallowed this deduction on the ground that the costs of completing Del Mar jobs were not incurred during the year ended April 30, 1974, and even if incurred, were not ordinary and necessary business expenses of Magnon Service.

Since its incorporation in 1968, Magnon Service consistently kept its books and filed its tax returns under what amounted to a cash receipts and disbursements method of accounting. With

respect to Magnon Service's income from its long-term contracts, such amounts were recorded on its books and reported on its returns either as they were actually received or when there was no question as to their payment. Although no conclusive testimony has been presented concerning the corporation's treatment of costs related to long-term contracts, it appears that such expenses have been listed on the books and deducted on the returns as they were incurred. The exact amounts of such receipts and expenses cannot be determined, however, since the corporation has failed to submit either its book entries or its tax return computations pertaining to its long-term contracts.

Due to the poor condition of Magnon Service's books and records, the corporation's lending bank, the Bank of America, Mission Boulevard, in Riverside, Calif., had refused to lend the corporation any more money until it had a professional accountant perform an audit and prepare financial statements. By October of 1971, Magnon Service had retained the services of George A. Arzoo, a certified public accountant, in order to comply with the bank's requests. The bank further required that the percentage of completion method of accounting for long-term contracts be used for credit purposes. Accordingly, Arzoo adopted the percentage of completion method for long-term contracts in preparing Magnon Service's financial statements for the bank.

Thus, on Magnon Service's financial statements for the years ended April 30, 1971, and April 30, 1972, Arzoo complied with the bank's request by recording income and expenses from long-term contracts on the percentage of completion method of accounting. Under this method, the corporation accrued as income that portion of the total contract price which was allocable to contract expenditures incurred and work performed as based on its engineering estimates of the percentage of completion of the project; and it accrued the entire amount of an estimated loss on a contract as soon as it learned of the loss.

In his statutory notice dated February 2, 1977, respondent determined that Magnon Service had used the percentage of completion method of accounting with respect to long-term contracts on its books and records but that, due to its use of an unrecognized "hybrid" method for such items on its tax returns, it had understated its gross income. Based on his authority to place a taxpayer on a consistent and accepted method of

accounting for long-term contracts under section 1.451–3(a)(1), Income Tax Regs., respondent placed Magnon Service on the percentage of completion method for reporting purposes and made the following adjustments in order to properly reflect its taxable income for the years in issue:

| FYE Apr. 30— | Increase in taxable income | (Decrease in taxable income) |
|---|---|---|
| 1969................ | $21,248 | 0 |
| 1970................ | 287,228 | 0 |
| 1971................ | 237,607 | 0 |
| 1972................ | 0 | ($205,010) |
| 1973................ | 0 | (341,073) |

Respondent justified these changes by claiming that Magnon Service's use of the percentage of completion method for bookkeeping purposes constituted an "election" of that method for reporting purposes as well under section 1.451–3(a)(2), Income Tax Regs. In fact, however, Magnon Service has consistently used the cash method on its books and records; and it has never submitted a formal statement that it elected the percentage of completion method for reporting purposes as required by section 1.451–3(a)(2), Income Tax Regs.

OPINION

### 1. Constructive Dividend Issue

The first issue for decision is whether Magnon received taxable income to the extent that Magnon Service, of which he was president and sole shareholder along with his wife, performed services on his own personal projects during 1970 and 1971. Related to this question is the issue of the deductibility under section 162 of Magnon Service's expenditures in providing such services.

Magnon contends that Magnon Service's advances to him during the years in question were bona fide loans, since he always intended to repay the corporation for its work on his personal projects. As evidence of his intent to repay, Magnon relies on the following points: (1) His financial ability and definite plan to repay such advances with his personal income and loans acquired on buildings which Magnon Service completed for him; (2) his ability to obtain similar advances from an

unrelated lender; (3) his actual repayment of all such advances during subsequent years; (4) his contractual obligation to pay the corporation a reasonable profit for its services; and (5) Magnon Service's entry of such advances in the subsidiary job cost ledgers of its books as accounts receivable due from Magnon.

In accordance with Magnon's argument, Magnon Service asserts that the full amount of its costs incurred on Magnon jobs is deductible as an ordinary and necessary business expense during its taxable year ended April 30, 1971.

The respondent contends that Magnon never intended to repay Magnon Service for the work done on his personal properties and that, therefore, the corporation's expenditures on these jobs during each of the years in question constitute constructive dividends to Magnon. On that basis, respondent argues that Magnon Service is not entitled to deduct such payments under section 162.

It is clear that the corporation performed valuable services for Magnon as sole shareholder and deducted the costs of those services as a business expense. The issue which we must decide is whether Magnon received the corporation's services as a loan or a constructive dividend. The resolution of this question will determine the deductibility of the corporation's costs in providing services to Magnon.

Section 61(a)(7) requires that a dividend shall be included in a taxpayer's gross income. Section 316(a) defines a dividend as "any distribution of property made by a corporation to its shareholders" from earnings and profits accumulated after 1913 or earnings and profits of the taxable year. Section 1.317–1, Income Tax Regs., provides that "the term 'property' * * * means any property (including money, securities, and indebtedness to the corporation) other than stock, or rights to acquire stock, in the corporation making the distribution." The provision of services by a corporation has been held to be "property" within the meaning of section 1.317–1, Income Tax Regs. *Loftin & Woodard, Inc. v. United States*, 577 F.2d 1206, 1214 (5th Cir. 1978); *Benes v. Commissioner*, 42 T.C. 358, 379 (1964), affd. 355 F.2d 929 (6th Cir. 1966).

Where a corporation confers an economic benefit on a shareholder without the expectation of repayment, that benefit becomes a constructive dividend, taxable to the shareholder,

even though neither the corporation nor the shareholder intended a dividend. However, "not every corporate expenditure which incidentally confers economic benefit on a shareholder is a constructive dividend." The crucial test of the existence of a constructive dividend is whether "the distribution was primarily for the benefit of the shareholder." *Loftin & Woodard, Inc. v. United States, supra* at 1214; *Crosby v. United States,* 496 F.2d 1384, 1388 (5th Cir. 1974); *Sammons v. Commissioner,* 472 F.2d 449 (5th Cir. 1972), affg., revg., and remanding a Memorandum Opinion of this Court.

In the instant case, Magnon Service performed the electrical contracting services in issue primarily for Magnon's benefit as sole shareholder. All of the properties on which the corporation did work were owned by Magnon either in his own name or with partners. Moreover, there is no evidence in the record that Magnon ever intended that Magnon Service would acquire any interest in the properties on which it was working. See *Benes v. Commissioner, supra* at 379. Rather, the main purpose for the agreement between the corporation and Magnon, as recorded in the corporation's minutes for December 7, 1970, was to provide the sole shareholder with needed services at a low cost and with loose terms for repayment. Given that Magnon Service's agreements to perform jobs for unrelated customers usually provided for higher profit margins and more definite terms for repayment than did its agreement with Magnon, any business purpose for the corporation entering into the transaction with Magnon would be inadequate to disturb our conclusion that the corporation's services were performed primarily for the sole shareholder's benefit. *Sammons v. Commissioner, supra* at 453.

Magnon Service also performed the services herein for Magnon without any expectation of being repaid for them. In *Benes v. Commissioner, supra,* we held (42 T.C. at 379) that where a taxpayer-shareholder has a corporation build property on his behalf, the costs incurred constitute a constructive dividend to the shareholder if: (1) He intends the property to be his from the very beginning, and (2) the shareholder has no intention of repaying the corporation either during or upon completion of the construction. Since Magnon apparently intended that the properties on which Magnon Service did work would remain his own from the start, he attempts to escape the result in *Benes* by arguing that he always intended to repay the

corporation for its services. Based on the facts herein, however, we conclude that Magnon never intended to repay the corporation either during or upon the completion of its services and that Magnon's receipt of those services therefore constituted dividends to him during the years that the work was performed.

The factors relied upon by Magnon as evidence of his intent to repay are either unsubstantiated in the record or irrelevant to the issue of his actual intent. Magnon's self-serving testimony that he had a definite plan to repay the corporation with his own income and various loans is unfounded, since (1) his agreement with Magnon Service omitted any terms for repayment, and (2) his payments to the corporation were not made in a systematic or orderly manner. Magnon also failed to support his argument that he was financially able to repay the corporation, and, even if he had done so, there is no evidence that he would have actually used such funds to repay his wholly owned corporation. Furthermore, Magnon's bare assertion that he could have obtained a construction loan from an unrelated lender for services similar to those performed by Magnon is without significance, since there is no evidence in the record that he ever had any such ability.

Moreover, Magnon has not proved that he actually repaid Magnon Service for its work on his properties. His lack of intention to repay the corporation is evidenced by his failure to make any repayments of the $192,197.47 in issue either during the years that those job costs were incurred or when the work was completed. *Benes v. Commissioner, supra* at 379. He did make subsequent payments to Magnon Service on a total balance owing of $721,716 between September of 1972 and April 30, 1978, at which time the corporation's general ledger for accounts receivable from Magnon showed a zero balance. However, the record is unclear as to how and when the particular job costs in issue were repaid, since (1) the general ledger entries showing credits to Magnon's account did not contain descriptions allocating each payment to a specific job and stating the source of each payment, and (2) Magnon's testimony that he used cash, bank loans, and proceeds from the sale of some stock to repay the corporation did not identify which funds were used to repay the costs here in issue. A mere reduction of Magnon's total balance owing from $721,710 to zero on the corporation's general ledger, without more evidence as to

how and when the $192,197.47 herein was repaid, will not support Magnon's argument that he repaid the job costs in issue after the years in which those services were performed and completed.

It also appears that Magnon Service did not expect Magnon to repay its job costs either during or upon completion of its work, since the corporation's accounting for those costs on its books was inadequate. The $192,197.47 in issue was entered only in the corporation's subsidiary job cost ledgers, without a statement that the amount was due from anyone or carried interest, and without accompanying entries transferring the sum to a general ledger for accounts receivable or loans receivable from Magnon. Even the corporation's accountant, George Arzoo, who had performed an audit and prepared a financial statement for Magnon Service in 1972, stated that he was unable to determine the total amount that Magnon owed to the corporation.

The corporation also failed to take any steps to enforce Magnon's promise to pay for this work or to issue any instruments of indebtedness with respect to this amount of job costs. Moreover, until an increase was made in the corporation's retained earnings on its tax return for the year ended April 30, 1972, none of this sum was reported as income. After such failure to keep track of amounts it spent on Magnon projects, Magnon Service could not have expected any repayments from Magnon during the years in issue.

Having thus determined that Magnon received constructive dividends from Magnon Service, we must next compute the amounts of those dividends. *Loftin & Woodard, Inc. v. United States, supra* at 1215. Section 316(a) provides that distributions of property made by a corporation to its shareholders are taxable dividends only to the extent of the corporation's accumulated earnings and profits since February 28, 1913, or its current earnings and profits of the taxable year.

We have found that the full amounts of $109,811.38 and $82,386.09, respectively, constituted distributions from Magnon Service to Magnon for the taxable years ended December 31, 1970, and December 31, 1971. In view of the questions presented herein, neither party was prepared at the trial to submit computations of the earnings and profits of Magnon Service available for distribution as a taxable dividend. In a recomputation of the deficiency hereunder, the parties will be permitted to

submit computations of earnings and profits in accordance with this opinion.

Lastly, since we have found that the corporation's job costs on Magnon projects were distributions to Magnon with respect to his stock, none of those costs were deductible by the corporation as ordinary and necessary business expenses during the years in issue. *Loftin & Woodard, Inc. v. United States, supra* at 1235; *American Properties, Inc. v. Commissioner,* 28 T.C. 1100, 1115 (1957), affd. 262 F.2d 150 (9th Cir. 1958).

## 2. *Bad Debt Issue*

The next issue for decision is whether Magnon Service's forgiveness of Del Mar's indebtedness in the amount of $337,300 during the course of their business dealings in 1973, constitutes a constructive dividend in that year to Magnon as their common sole shareholder. Related to this question is the issue of whether Magnon Service is entitled to deduct this amount as a bad debt under section 166 during its taxable year ended April 30, 1973.

Respondent's main contention is that Magnon Service's forgiveness of Del Mar's $337,300 debt constituted a constructive dividend to Magnon during 1973. Respondent asserts that since Magnon failed to adequately capitalize Del Mar, Magnon Service had the right as a creditor to look to Magnon, Del Mar's sole shareholder, for reimbursement. Thus, respondent concludes that when Magnon Service relieved Magnon of his liability on Del Mar's debt, it conferred a direct benefit on Magnon equivalent to a dividend. In further support of his dividend argument, respondent contends that Magnon Service forgave its sister corporation's debt, not for any of its own business reasons, but to advance the personal business interests of Magnon. In the event that the Court should find that the advances were a bona fide loan, respondent further contends that Magnon Service's deduction of this amount as a bad debt in 1973 was, nevertheless, premature, since the debt did not become worthless until the filing of the bankruptcy petition on May 8, 1974.

Where a corporation makes a distribution to its shareholder for his personal benefit or in discharge of his personal debts, a dividend may exist even though the funds are not distributed directly to him. Moreover, a transfer of property between related corporations will constitute a dividend to the sole shareholder of both if it was made primarily for his benefit and

conferred a direct or tangible benefit on him. However, the mere fact that an individual is the sole shareholder of both corporations and might derive an indirect or incidental benefit from the transfer will not bring about a constructive dividend. *Kuper v. Commissioner*, 533 F.2d 152 (5th Cir. 1976), affg. in part and revg. in part 61 T.C. 624 (1974); *Sammons v. Commissioner*, 472 F.2d 449 (5th Cir. 1972), affg., revg., and remanding a Memorandum Opinion of this Court; *Rapid Electric Co. v. Commissioner*, 61 T.C. 232 (1973); *Ross Glove Co. v. Commissioner*, 60 T.C. 569 (1973).

In the instant case, Magnon Service's forgiveness of Del Mar's debt was not made primarily for the benefit of Magnon and did not confer a direct or tangible benefit on him. Instead, the corporation's primary purpose in discharging Del Mar on its debt was to advance its own business interests.

Initially, Magnon Service advanced funds to Del Mar in order to improve its relationship with its largest customer, E. W. Hahn. Due to problems which Hahn was having completing its jobs with its electrical contractors in northern California, Hahn wanted Magnon to form and operate a reliable electrical contracting company in that region. However, between Del Mar's formation on September 25, 1970, and its discharge on its debt to Magnon Service on April 30, 1973, Del Mar had persistent financial troubles which caused it to borrow funds from Magnon Service in order to pay its bills and service its customers. So long as Magnon Service helped Del Mar perform its work for Hahn, Magnon Service benefited: (1) By preventing any potential adverse impact on itself if Hahn continued to have trouble completing its northern California jobs; and (2) by receiving jobs with Hahn through informal negotiations rather than the normal bidding process, which improved its bargaining position with Hahn as compared to other electrical contractors. Thus, in the context of Magnon Service's improved relationships with Hahn, the corporation's forgiveness of Del Mar's debt was prompted by its own interests in helping Del Mar to stay in business.

Magnon Service's interest in releasing Del Mar from liability on its debt, and thus in helping to keep Del Mar in business, was also based on several benefits it received from its brother-sister relationship with Del Mar. Magnon Service's arrangement with Del Mar, whereby each corporation performed the other corpora-

tion's jobs located in its own region as subcontractor and then split the profits from those jobs with the other corporation, benefited Magnon Service by allowing it to (1) obtain new business with two or three general contractors in southern California for jobs to be performed in northern California, and (2) increase its existing services to other general contractors in southern California, including Hahn. Magnon Service's affiliation with Del Mar also helped it get larger performance bonds and larger loans than it could have acquired individually. Such bonds and loans, in turn, allowed Magnon Service to undertake larger projects than it could have obtained by itself.

Moreover, the substantial business reasons which Magnon Service had for discharging Del Mar on its debt clearly refute any argument that the action was taken primarily for Magnon's benefit. *Sammons v. Commissioner, supra* at 452; *Ross Glove Co. v. Commissioner, supra* at 596. There is no proof that Magnon would have directly or tangibly benefited from Magnon Service's action in any event, since it is unclear from the record whether Magnon had ever personally guaranteed payment of Del Mar's debts, whether Del Mar otherwise would have defaulted on its obligation, and whether Magnon Service would have enforced the debt against its own sole shareholder. *Schwartz v. Commissioner*, 69 T.C. 877, 884 (1978); *Wortham Machinery Co. v. U.S.*, 521 F.2d 160, 164 (10th Cir. 1975).

Nor did Magnon Service's forgiveness of Del Mar's debt result in any diversion of funds from the corporate chain of ownership to or for the benefit of Magnon. *Sammons v. Commissioner, supra* at 453. Any benefit which Magnon might have received due to Magnon Service's action was merely derivative of his position as sole shareholder of Del Mar, incidental to the corporation's own interests in keeping Del Mar in business, and therefore insufficient to support the inference of a constructive dividend. *Schwartz v. Commissioner, supra* at 887; *Rapid Electric Co. v. Commissioner, supra* at 240.

We also fail to find any basis on which to disregard Del Mar as a taxable entity separate and apart from Magnon, its sole shareholder. At the time Magnon Service forgave Del Mar's debt, Del Mar remained a going concern with some inventory, receivables, and a valuable contract right to be paid by Morrow-Meadows between November 1, 1973, and December 31, 1973, for the sale of several of its physical assets. Moreover, there is no

evidence in the record that either Magnon or Magnon Service disregarded Del Mar's corporate entity in their dealings with it.

Having thus decided that Magnon Service's forgiveness of Del Mar's debt did not constitute a constructive dividend to Magnon, we now address the related question of whether Magnon Service is entitled to deduct the amount of that debt under section 166.

Section 166(a) provides that a taxpayer may deduct any debt which becomes either wholly or partially worthless within the taxable year but only to the extent of such worthlessness. Moreover, in order to receive a deduction under section 166(a), a taxpayer must present proof that the debt was bona fide and evidence of the debt's worthlessness. Secs. 1.166–1(c), 1.166–2, Income Tax Regs. Since respondent has conceded that the debt in question was bona fide, we need only decide the question of its worthlessness. On that point, respondent contends that Magnon Service's deduction of the $337,300 as a bad debt in 1973 was premature, since the debt did not become worthless until the filing of Del Mar's bankruptcy petition on May 8, 1974. We agree.

Section 1.166–2(c)(1), Income Tax Regs., provides that bankruptcy is usually evidence of the worthlessness of at least part of an unsecured and unpreferred debt. With respect to the year of deduction for debts in bankruptcy cases, section 1.166–2(c)(2), Income Tax Regs., states that a debt may become worthless either before or upon settlement of the suit, but that, in any event, the mere fact that the suit brought against the debtor was ended in a later year does not authorize the shifting of the deduction to that later year.

In the instant case, Magnon Service has failed to prove that Del Mar's debt to it became worthless during its taxable year ended April 30, 1973. Magnon Service failed to show that any steps were taken to collect the debt, that sufficient information was available to prove that the debt was uncollectible, or that there was any identifiable event which would justify the writeoff. *Byerlite Corp. v. Williams*, 286 F.2d 285 (6th Cir. 1960); *Higginbotham-Bailey-Logan Co. v. Commissioner*, 8 B.T.A. 566 (1927).

On the other hand, the evidence in the record indicates that throughout the year ended December 31, 1973, Del Mar remained a going concern with inventory, receivables, and a valuable contract right to be paid for some assets which it had

sold to Morrow-Meadows. The contract provided that the parties could determine a purchase price for the assets as late as December 31, 1973, but that Morrow-Meadows would have to pay that sum between November 1, 1973, and December 31, 1973.

## 3. *Business Expenses Issue*

The next question for decision is whether during the taxable year ended April 30, 1974, Magnon Service is entitled to a deduction under section 162,[5] for $251,635.57 which it paid in order to reimburse Morrow-Meadows for the excess costs incurred by it in completing Del Mar jobs pursuant to its contract with Magnon Service and Del Mar.

Magnon Service contends that it is entitled to deduct its payment of Morrow-Meadow's excess costs in completing Del Mar jobs as an ordinary and necessary business expense for several reasons. The corporation argues that this expenditure was necessary in order to protect its business from the risk that, unless it agreed to assume liability for Del Mar's debts, Morrow-Meadows would not have contracted to complete the jobs in which Magnon Service and Del Mar had a joint interest.

Magnon Service also asserts that this expenditure was necessary since it was contractually obligated to pay Del Mar's debts under its agreement with Morrow-Meadows. As support for its interpretation of the contract, Magnon Service argues that Morrow-Meadows would not have required it to enter into the agreement with Del Mar or billed it for Del Mar's excess job costs under the contract if it intended to have Del Mar pay its own debts.

Finally, the corporation argues that its payment of Del Mar's expenses was ordinary since the transaction giving rise to it, specifically a judgment requiring Magnon Service to pay the debts of its sister corporation pursuant to a contract, was of common occurrence in the electrical contracting business.

Respondent contends that Magnon Service is not entitled to deduct its payment of Del Mar's job costs under section 162, since it has not been shown that those costs were incurred during the year ended April 30, 1974, and, even if they were

---

[5]The amount and resolution of this issue relate to the years before the Court only in the computation of the net operating loss carryback from the taxable year ending Apr. 30, 1974.

incurred during that year, such costs are ordinary and necessary business expenses only of Del Mar. Moreover, respondent asserts that Magnon Service's payment of Del Mar's debts did not cause it to recognize any benefits in its own business which would, in turn, render that expenditure deductible by it. Respondent further argues that Magnon Service was not obligated under its contract with Morrow-Meadows to pay any debts or expenses of Del Mar.

Section 162(a) allows a taxpayer to deduct all ordinary and necessary expenses which it paid or incurred during the taxable year in carrying on its trade or business.

Magnon Service was billed by Morrow-Meadows for the $251,635.57 in issue in its taxable year ended April 30, 1974. During that same year, however, Magnon Service failed to make any payments of this amount billed. The evidence indicates that the first time Magnon Service made payments to Morrow-Meadows was during its taxable year ended April 30, 1977, when it transferred assets worth $330,000 in order to satisfy a judgment against it for unpaid billings which covered excess costs in completing jobs transferred by itself and by Del Mar. Apparently, the $251,635.57 of excess costs on Del Mar jobs was repaid by this transfer of assets.

Accordingly, due to Magnon Service's failure to pay any of the $251,635.57 in issue during its taxable year ended April 30, 1974, it is not entitled to a deduction for any of that amount under section 162 for that year. Moreover, since the taxable year ended April 30, 1977, during which Magnon Service repaid the expenses in issue, is not in dispute, we need not decide the question of the deductibility of that amount as a business expense for that year.

### 4. *Accounting Issue*

The next issue which we must decide is whether Magnon Service could properly follow the cash method of accounting in reporting the income and expenses from its construction contracts.

In his statutory notice of deficiency, the respondent determined that since Magnon Service used the percentage of completion method with respect to its construction contracts on its books and records, its use of an inconsistent "hybrid" method for such items on its tax returns had caused it to understate its gross income. Relying on his authority to place a taxpayer on a

consistent and accepted method of accounting for long-term contracts under section 1.451–3(a)(1), Income Tax Regs., respondent put Magnon Service on the percentage of completion method for reporting purposes and adjusted its gross income accordingly. In support of his adjustments, respondent contends that Magnon Service's use of the percentage of completion method on its books and records constituted an election of that method for reporting purposes as well under section 1.451–3(a)(2), Income Tax Regs.

Magnon Service argues that the respondent's accounting adjustments are erroneous since: (1) It never used the percentage of completion method of accounting for construction contracts on its books and records; (2) it never filed a formal statement that it elected the percentage of completion method for reporting purposes; (3) its use of the percentage of completion method on its financial statements did not constitute an election of that method for reporting purposes; and (4) respondent failed to make a determination under section 446 that its method of accounting on its tax returns did not clearly reflect its income.

Section 446 states that taxable income shall be computed in accordance with the method of accounting regularly used by the taxpayer in keeping his books, but that if that method does not clearly reflect income, the computation shall be made in accordance with such method as, in the opinion of the Commissioner, does clearly reflect income. Section 1.446–1(a)(2), Income Tax Regs., provides that:

A method of accounting which reflects the consistent application of generally accepted accounting principles in a particular trade or business in accordance with accepted conditions or practices in that trade or business will ordinarily be regarded as clearly reflecting income, provided all items of gross income and expense are treated consistently from year to year.

With respect to income and expenses from long-term contracts, section 1.451–3(a)(1), Income Tax Regs., permits a taxpayer to report such items in accordance with one of the two long-term contract methods, either the percentage of completion or completed contract method, or under any other method so long as the method chosen clearly reflects income. Section 446(c)(1) provides that the cash receipts and disbursements method of accounting is generally permissible for tax purposes unless it does not clearly reflect income. Accordingly, a taxpayer

may properly use the cash receipts and disbursements method to report income and expenses from his long-term contracts.

Since its incorporation in 1968, Magnon Service has consistently kept its books and filed its tax returns under what amounted to a cash receipts and disbursements method of accounting. Prior to Magnon Service's formation, its predecessor, an electrical contracting business conducted by Magnon as a sole proprietorship, also used this same cash method on its books and tax returns. Under this method, Magnon Service has regularly reported its income from construction contracts either when actually received or when there has been no question as to payment; and it has regularly deducted such expenses as incurred.

Magnon Service has never submitted a formal statement that it elected the percentage of completion method for reporting purposes as required by section 1.451–3(a)(2), Income Tax Regs. Moreover, Magnon Service's use of the percentage of completion on its financial statements pursuant to the request of its lending bank did not constitute an election of that method for reporting purposes. In light of Magnon Service's consistent use of the cash method on its books and tax returns, the corporation's use of the percentage of completion method on its financial statements may have resulted in a better reflection of its lending capacity to the bank, but it does not bind it for tax purposes.

Respondent appears to be primarily concerned that Magnon Service's use of the cash method herein has resulted in a distortion of its income since the corporation did not receive or report various amounts due under some long-term contracts until after the year during which construction on a project was completed and the expenses incident thereto were recorded. However, the respondent has failed to make an express determination under section 446 that Magnon Service's cash method of accounting for its construction contracts did not clearly reflect such income. Moreover, even if the respondent had made such a determination, there is no evidence in the record that the cash method used by Magnon Service did not clearly reflect its income.

The cash method of accounting has been widely used throughout the contracting industry and accepted by the respondent since time immemorial. Congress has given consideration to the problem of distortion of income which results from use of the

cash method due to the mismatching of income and expenses under that method. S. Rept. 94–938 (1976), 1976–3 C.B. (Vol. 3) 112. In this report which deals with the deductibility of production costs in the film industry, the Senate Finance Committee cites *C. A. Hunt Engineering Co. v. Commissioner,* T.C. Memo. 1956–248, a decision of this Court involving a construction corporation on the cash method that is directly on point with respect to the issue herein. S. Rept. 94–938, *supra,* 1976–3 C.B. (Vol. 3) at 113.

In *C. A. Hunt Engineering Co. v. Commissioner, supra,* a corporation which constructed apartments and shopping centers under long-term construction contracts had deducted its costs on the cash method but had received some payments over a 5-year period after the completion of a particular project. With respect to the problem of mismatching, we concluded therein that any distortion which may have resulted from delayed payments on account by customers did not, by itself, convince us that the cash method used by the corporation did not clearly reflect its income. Accordingly, since the corporation had consistently recorded its income from construction contracts on its books using a cash method of accounting, we held that it could properly report such items on its tax returns using that same method.

The same reasoning is applicable in the instant case. We also note that the cash method used by Magnon Service need not show its exact receipts and expenses in order to clearly reflect its income:

> The case turns largely upon what is meant by the requirement that the method of accounting shall clearly reflect the income. If this requirement is absolute, it is safe to say that books kept on the basis of cash received and disbursed will rarely, if ever, reflect the true income, because nearly always at the end of a tax year accounts due the taxpayers will remain uncollected and some of his own obligations will remain unpaid. But we do not think that any such literal construction was contemplated. In our opinion, all that is meant is that the books shall be kept fairly and honestly; and when so kept they reflect the true income of the taxpayer within the meaning of the law. In other words, the books are controlling, unless there has been an attempt of some sort to evade the tax. This construction may work to the disadvantage of the taxpayer or the government at times, but if followed out consistently and honestly year after year the result in the end will approximate equality as nearly as we can hope for in the administration of a revenue law. [*Osterloh v. Lucas,* 37 F.2d 277, 278–279 (9th Cir. 1930).]

Therefore, since Magnon Service's cash method of accounting

was in accordance with generally accepted accounting principles, was consistently used over a long period of time, and clearly reflected its income, the respondent must also accept it for tax purposes. *Heaven Hill Distilleries, Inc. v. United States*, 201 Ct. Cl. 423, 476 F.2d 1327 (1973); sec. 1.446–1(a)(2), Income Tax Regs.

## 5. *Penalty Issues—Magnon*

We must next decide whether Magnon is liable for the penalty under section 6651(a)[6] due to his failure to timely file his 1971 joint income tax return. Section 6651(a) provides for an addition to tax for failure to file return timely, but the addition is not applicable if it is proved that such failure is due to reasonable cause and not due to willful neglect. The taxpayer has the burden of proving that such failure was due to reasonable cause. *Electric & Neon, Inc. v. Commissioner*, 56 T.C. 1324, 1342 (1971), affd. without published opinion 496 F.2d 876 (5th Cir. 1974).

Magnon did not file his joint Federal income tax return for the year ended December 31, 1971, until January 28, 1974. Magnon's only excuses for his late filing were: (1) That "unresolved differences" remained with respect to an audit performed by the respondent in 1970, and (2) that he relied on his accountant, George Arzoo, to prepare and file his personal tax return. However, Magnon failed to specify what "differences" existed and how any such differences justified his late filing. As for his second excuse, Magnon asserts that since Arzoo was newly hired in 1971 and was unable to prepare accurate returns for Magnon and Magnon Service until he corrected Magnon Service's books and records, presumably as of January 28, 1974, there was reasonable cause for waiting until such time to file Magnon's 1971 tax return.

Despite such reasoning, however, neither Magnon nor Arzoo ever requested an extension of time for filing the return in question. Moreover, the evidence indicates that Magnon had

---

[6]SEC. 6651. FAILURE TO FILE TAX RETURN OR TO PAY TAX.

(a) ADDITION TO THE TAX.—In case of failure—

(1) to file any return required under authority of subchapter A of chapter 61 * * * on the date prescribed therefor (determined with regard to any extension of time for filing), unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate, * * *

participated in filing his personal tax returns prior to the year in issue and that he knew that such a return was due for 1971. When responsibility for preparing and filing a return known to be due is delegated by a taxpayer, failure of the delegate does not, without more, constitute reasonable cause for the taxpayer's failure to timely file. *Inter-American Life Insurance Co. v. Commissioner*, 56 T.C. 497, 511 (1971), affd. per curiam 469 F.2d 697 (9th Cir. 1972); *Estate of Duttenhofer v. Commissioner*, 49 T.C. 200 (1967), affd. per curiam 410 F.2d 302 (6th Cir. 1969). On this record, we conclude that Magnon has not proved that this failure to file a timely return was due to reasonable cause.

The respondent also imposed the negligence penalty on Magnon for the years 1970 through 1973. Section 6653(a)[7] provides for the imposition of a 5-percent penalty when the deficiency resulting from an underpayment is due to negligence or intentional disregard of the rules and regulations. The taxpayer has the burden of proving that no part of the underpayment was due to negligence. *Mitchell v. Commissioner*, 51 T.C. 641, 647 (1969), revd. 430 F.2d 1 (5th Cir. 1970), revd. 403 U.S. 190 (1971); *Rosano v. Commissioner*, 46 T.C. 681, 688 (1966). First, based on our holding that Magnon did not receive a constructive dividend in 1973 and on the fact that no deficiencies were in dispute for 1972, we conclude that Magnon is not liable for the section 6653(a) addition for the years 1972 and 1973.

With respect to 1970 and 1971, Magnon argues that no negligence penalties should attach due to (1) the existence of substantial issues of law and fact with respect to the deficiencies against him and (2) his reliance on his accountant to accurately prepare and file his tax returns. As support for his first argument, Magnon cites *Kasey v. Commissioner*, 54 T.C. 1642 (1970), affd. 457 F.2d 369 (9th Cir. 1972), cert. denied 409 U.S. 869 (1972), wherein we held that a taxpayer was not liable for the negligence penalty where he had a good-faith belief that his deductions were allowable and that they presented substantial issues of law and fact. (54 T.C. at 1651.)

We agree that the constructive dividends imposed against

---

[7] SEC. 6653. FAILURE TO PAY TAX.

(a) NEGLIGENCE OR INTENTIONAL DISREGARD OF RULES AND REGULATIONS WITH RESPECT TO INCOME OR GIFT TAXES.—If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A or by chapter 12 of subtitle B (relating to income taxes and gift taxes) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.

Magnon for these years did, in fact, involve substantial issues of law and fact. However, *Kasey* requires that the taxpayer have a good-faith belief that the issues are substantial and that he is correctly reporting his income. We fail to see how Magnon could have had a good-faith belief that the received no income during the years that this wholly owned corporation, Magnon Service, performed work for him personally without any repayment.

Magnon's argument regarding the accountant is identical with his argument under section 6651(a). We reject this for the reasons therein stated and hold for the respondent on this issue. Moreover, we note that with respect to 1971, Magnon's failure to exercise due care in timely filing a return, even though he knew that return was due, constitutes further support for the imposition of the negligence penalty for that year. *Mitchell v. Commissioner, supra* at 648; *Robinson's Dairy, Inc. v. Commissioner*, 35 T.C. 601, 608–609 (1961), affd. 302 F.2d 42 (10th Cir. 1962).

### 6. *Penalty Issue—Magnon Service*

The respondent also determined that Magnon Service was liable for the negligence penalty under section 6653(a) for the years ended April 30, 1971, and April 30, 1973. However, based on our holding that Magnon Service is entitled to a bad debt deduction for its advances to Del Mar during 1974 rather than 1973 and that it issued no constructive dividends to Magnon as a result of those advances during 1973, we conclude that the respondent's imposition of the negligence penalty on the corporation for the year ended April 30, 1973, was erroneous.

Nevertheless, with respect to the year ended April 30, 1971, Magnon Service has failed to carry its burden of proving that none of the underpayment for that year was due to negligence. The record shows that Magnon Service failed to keep adequate records of its income and expenses during the year in question. Aside from the inadequacy of its records, the corporation deducted $192,197.47 during its taxable year ended April 30, 1971, for costs incurred in completing jobs on property belonging to Magnon. During that same year, however, Magnon Service failed either to report or to carry as a receivable in its general ledger these expenditures. Accordingly, we find no error in

respondent's determination of an addition to tax under section 6653(a) for that year.

*Decisions will be entered under Rule 155.*