T.C. Memo. 2005-66


UNITED STATES TAX COURT


JOHN F. MORAN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 11586-01.               Filed March 30, 2005.


John F. Moran, pro se.

<u>Gerald A. Thorpe</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

RUWE, <u>Judge</u>:  Respondent determined deficiencies, penalties, and additions with respect to petitioner's Federal income tax as follows:

|  |  | Additions to Tax | |
| Year | Deficiency | Sec. 6653(b)(1) | Sec. 6661 |
| 1988 | $47,881 | $37,298 | $11,970 |

|  |  | Addition to Tax | Penalty |
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6663 |
| 1989 | $36,620 | $5,306 | $27,465 |

|  |  | Penalty |
| Year | Deficiency | Sec. 6663 |
| 1990 | $21,488 | $16,116 |

The issues for decision are:

(1) Whether petitioner received unreported constructive dividends from Moran General Contractors, Inc. (the corporation), by diverting corporate receipts and issuing corporate checks for fictitious expenses in the amounts of $149,747 in 1988, $84,315 in 1989, and $100,890 in 1990;

(2) whether petitioner received additional unreported constructive dividends during 1988, 1989, and 1990 of $11,233, $20,439, and $8,060, respectively, from the personal use of the corporation's property;

(3) whether petitioner is entitled to deduct under section 162,[1] as expenses of an unincorporated beauty shop business of which he was a proprietor, payments of $11,500 in 1989 and

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

$16,000 in 1990, which he allegedly received as reimbursements for renovations of the beauty shop;

(4) whether petitioner is entitled to deduct under section 162 expenses of $3,210 in 1989 and $14,951 in 1990 allegedly paid to beauty shop employees;

(5) whether petitioner is entitled to deduct additional expenses allegedly paid in the beauty shop business and horse racing activities in 1988, 1989, and 1990;

(6) whether petitioner is entitled to depreciation deductions under section 167 of $3,097 and $1,658 in 1989 and 1990, respectively, in relation to the beauty shop;

(7) whether petitioner is liable for additions to tax and penalties under sections 6653(b)(1) and 6663 for filing fraudulent income tax returns for 1988, 1989, and 1990;

(8) whether petitioner is liable for an addition to tax under section 6651(a)(1) for failing to timely file his income tax return for 1989;

(9) whether petitioner is liable for an addition to tax under section 6661 for the substantial understatement of tax liability on his Federal income tax return for 1988;

(10) whether petitioner filed joint Federal income tax returns in 1988, 1989, and 1990 when he did not sign the returns but granted his spouse permission to sign his name; and

(11) whether the statute of limitations bars the assessment and collection of the deficiencies in tax, additions to tax, and penalties that respondent has determined against petitioner for 1988, 1989, and 1990.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, the second stipulation of facts, and the attached exhibits[2] are incorporated herein by this reference.

Petitioner resided in Williamstown, New Jersey, when he filed his petition in this case.

During the years in issue, petitioner was married to Bonnie E. McNamara (formerly Bonnie E. Moran). Petitioner and Bonnie E. McNamara (Ms. McNamara) maintained a personal joint checking account at Continental Bank during the years in issue. Petitioner and Ms. McNamara are now divorced.

Ernest Agresto, a certified public accountant, prepared petitioner and Ms. McNamara's joint income tax returns for the years in issue. Mr. Agresto prepared these returns using information supplied by Ms. McNamara. With petitioner's permission, Ms. McNamara signed petitioner's name on their joint

---

[2] Respondent has objected on the grounds of relevancy and/or hearsay to the admission of the following exhibits: 176-P through 179-P, 183-P through 215-P, 222-P, 223-P, 227-P through 230-P, 232-P through 235-P, 237-P, 238-P, 243-P, and 244-P. At trial, we reserved ruling on these exhibits. We have considered each of the exhibits in question and find that they do not justify any alteration in our findings of fact.

Federal income tax returns for the years in issue.

During 1983 or 1984, petitioner and Ms. McNamara[3] organized the corporation.[4] The corporation engaged in the business of installing heavy machinery and equipment used by its customers in their manufacturing businesses. The corporation maintained a business checking account at PSFS Bank.

During the years in issue, all of the outstanding shares of the corporation's common stock were held in Ms. McNamara's name. Both petitioner and Ms. McNamara considered petitioner to be at least a part owner of the corporation during the years in issue. Petitioner and Ms. McNamara decided to issue all of the corporation's stock to Ms. McNamara for various business and personal reasons. Petitioner stated to respondent's agents that he and Ms. McNamara had the corporation's common stock issued to Ms. McNamara because the regulations of the union of which petitioner was a member prohibited its members from owning corporate stock.

During the years in issue, petitioner and Ms. McNamara were employees of the corporation. Petitioner considered his position in the corporation equivalent to that of a chief executive officer, and he made all significant business decisions for the

---

[3] At the time the corporation was organized, Ms. McNamara was known as Bonnie E. Moran.

[4] The corporation also did business as Moran General Contractors, Inc.

corporation. Ms. McNamara supervised the office functions, engaged in some sales activities, and handled some of the bookkeeping. Petitioner's daughter, Phyllis Moran, held a position at the corporation, where she performed "billing, typing, [and] posting" duties. The corporation also employed Ellen Moran, petitioner's mother, who was paid $50 a week. From 1987 to 1993, the corporation also employed Emma Brinton.

During the years in issue, Mr. Agresto also prepared the Federal income tax returns for the corporation. Ms. McNamara provided Mr. Agresto with information to prepare the corporation's income tax returns, including cash receipt summaries, cash disbursements, and payroll records.

Petitioner and Ms. McNamara diverted numerous checks issued to the corporation for services rendered by the corporation. The checks received by the corporation were either (1) cashed by petitioner or another employee and the proceeds were given to petitioner or Ms. McNamara, or (2) deposited into petitioner and Ms. McNamara's personal joint checking account maintained at Continental Bank. The amounts of those diversions were $70,672.15 for 1988, $35,497.58 for 1989, and $57,521.81 for 1990. See appendix A, listing checks diverted from the corporation. The proceeds from these checks were not recorded as income on the corporation's books or reported as gross receipts on any of the corporation's Federal income tax returns. These

diversions were not reported as income on petitioner's income tax returns. When first asked, petitioner falsely stated to respondent's agents that he was unaware that checks issued to the corporation had been deposited to his and Ms. McNamara's personal bank account.

During the years in issue, petitioner also engaged in a scheme whereby he caused the corporation to issue checks to cover fictitious expenses. The amounts issued for those fictitious expenses totaled $79,074.95 for 1988, $48,817.45 for 1989, and $43,367.80 for 1990. See appendix B, listing the checks issued by the corporation for fictitious expenses. The payees never received these checks. Either petitioner or another employee of the corporation cashed these checks and gave the proceeds to petitioner or Ms. McNamara. Petitioner, or a family member under his direction and control, prepared false invoices for the fictitious expenses and altered the canceled checks to create the appearance that the checks were issued for legitimate business purposes. These payments were recorded as expenses on the corporation's books. These payments were not reported on petitioner's Federal income tax returns.

In addition to the construction business, petitioner and Ms. McNamara engaged in a beauty salon business as proprietors. The beauty salon first operated under the name Media Hair and later under the name Gian Franco Faces. In 1988, petitioner and Ms.

McNamara hired Michael Kapusta and John D'Ambrosio to handle the day-to-day operation of the beauty salon. Gian Franco Faces maintained a business checking account at First Pennsylvania Bank, and Mr. Kapusta was authorized to sign checks drawn on that account.

In 1988, petitioner and Ms. McNamara relocated the beauty shop. Petitioner and Ms. McNamara agreed to pay for the renovations to the beauty shop with the understanding that Messrs. Kapusta and D'Ambrosio would reimburse them for renovation expenses. Petitioner and Ms. McNamara used the corporation's funds to pay for the renovations to the beauty shop. The beauty shop renovation costs were $60,202.97 for third-party vendor expenses and $38,472 for labor performed by the corporation's employees.

In 1989, petitioner and Ms. McNamara requested that Messrs. Kapusta and D'Ambrosio start making payments to reimburse petitioner and Ms. McNamara for the renovation costs. After paying petitioner and Ms. McNamara $100,337, Messrs. Kapusta and D'Ambrosio became 50-percent owners of the beauty salon business.

Initially, petitioner asked Mr. Kapusta to make the reimbursement payments in cash or by check drawn on the business account of the beauty shop. Mr. Kapusta issued checks from Gian Franco Faces' business checking account to reimburse petitioner and Ms. McNamara. Mr. Kapusta issued only one reimbursement

check payable to petitioner.  After receiving the initial check, petitioner requested that Mr. Kapusta issue the remaining reimbursement checks payable to Clairol, which was a supplier of beauty products.  The payments made by Mr. Kapusta to reimburse petitioner and Ms. McNamara for the renovations to the beauty shop were as follows:

| Check No. | Date | Amount | Payee | Description |
|---|---|---|---|---|
| 1170 | 3/11/89 | $500 | Petitioner | First installment |
| 1241 | 5/26/89 | 3,000 | Clairol | * * * products |
| 1354 | Aug. 1989 | 1,500 | Clairol | Supplies |
| 1402 | Sept. 1989 | 2,500 | Clairol | -- |
| 1247 | 11/22/89 | 2,000 | Clairol | Supplies |
| 1509 | 12/20/89 | 2,000 | Clairol | Supplies |
| 1551 | 1/24/90 | 2,000 | Clairol | Supplies |
| 1589 | 2/22/90 | 2,000 | Clairol | Supplies |
| 1620 | Mar. 1990 | 2,000 | Clairol | Supplies |
| 1839 | 9/18/90 | 6,000 | Clairol | Supplies |
| 1883 | Oct. 1990 | 2,000 | Clairol | Supplies |
| 1933 | Dec. 1990 | 2,000 | Clairol | Supplies |

The proceeds from these checks issued to petitioner or Clairol were deposited in petitioner and Ms. McNamara's personal joint checking account at Continental Bank.  The proceeds from these checks were not recorded as income on the corporation's books and records or reported as income on any of the corporation's, or of petitioner and Ms. McNamara's, Federal

income tax returns. Petitioner and Ms. McNamara deducted the Clairol payments on their Federal income tax returns.

To facilitate his various schemes, petitioner cashed checks at several locations. Maximilian Segich, a friend of petitioner's during the years in issue, operated a bar and restaurant that generated a substantial amount of cashflow. During 1988 through 1990, Mr. Segich often cashed the fictitious expense checks for petitioner. Some of the checks that Mr. Segich cashed were payable to Ronald Hudecheck, Guy Long, and Sebastiani Sprinkler Design, Inc., among others; however, none of the checks were made payable to either petitioner or Ms. McNamara. Petitioner also cashed diverted corporate checks through his bookie, James Pirollo, and his friend, John DeLio, who managed a business known as Jetro Cash & Carry.

During the years in issue, petitioner and Ms. McNamara engaged in a horse racing business as proprietors. From 1988 until sometime in 1989, petitioner and Ms. McNamara retained Hunter L. King to train their horses. Petitioner and Ms. McNamara issued checks payable to Mr. King totaling $63,075.55. After terminating Mr. King in 1989, petitioner and Ms. McNamara retained Pam Shavelson to train their horses. Petitioner and Ms. McNamara issued checks payable to Ms. Shavelson totaling $86,178.

During the years in issue, petitioner gambled regularly. He played cards with a group of friends weekly. On average, a

participant in the weekly card game could win or lose up to $500. Also, petitioner regularly bet on football games. In the years in issue, petitioner averaged two to three visits to the race track a week, where he bet on horse races. Petitioner and Ms. McNamara issued checks from their personal joint checking account at Continental Bank to the following payees:

| Payee | 1988 | 1989 | 1990 |
|-------|------|------|------|
| Boardwalk Regency Casino | $11,500 | $1,500 | $3,000 |
| Caesars Casino | 300 | -- | -- |
| Crystal Palace (Casino) | -- | 4,500 | -- |
| Resorts International | 4,000 | -- | -- |
| Trump Castle | 500 | -- | -- |
| Carnival Leisure Indus., Inc. (d.b.a. Beach Casino) | -- | 10,700 | -- |
| Total | $16,300 | $16,700 | $3,000 |

Petitioner was the defendant in the criminal case United States v. Moran, Criminal Action No. 96-412-1 (E.D. Pa. Aug. 5, 1998). Petitioner was indicted for aiding the filing of false joint tax returns for himself and Ms. McNamara for the taxable years 1989 and 1990 in violation of section 7206(2). On October 23, 1996, petitioner pled guilty to these charges. Petitioner filed a motion to withdraw his guilty plea, which the District Court denied. On February 21, 1997, the District Court for the Eastern District of Pennsylvania entered a judgment of conviction

in the criminal case on the basis of petitioner's guilty plea. On October 27, 1997, the Court of Appeals for the Third Circuit affirmed the judgment of conviction entered in the criminal case. No petition for certiorari was filed with the Supreme Court.

Ms. McNamara was indicted for the filing of false joint tax returns for the taxable years 1989 and 1990. Ms. McNamara pled guilty to these charges.

By March 8, 1993, petitioner and respondent had signed a Form 872-A, Special Consent to Extend the Time to Assess Tax, for the 1988 and 1989 taxable years. By March 9, 1994, petitioner and respondent had signed a Form 872-A for the 1990 taxable year.

OPINION

I. Understatement of Income - Constructive Dividends

During the taxable years in issue petitioner diverted corporate funds to himself, which he failed to report as income. Section 316(a) provides that a dividend means any distribution of property made by a corporation to its shareholders out of its earnings and profits. The portion of a distribution that is a dividend is included in the gross income of the recipient and taxable as ordinary income. Secs. 301(c), 316(a). Although the Code does not define earnings and profits, the calculation is based on adjustments made to the corporation's taxable income. DiLeo v. Commissioner, 96 T.C. 858, 888 (1991), affd. 959 F.2d 16 (2d Cir. 1992); see sec. 1.312-6(a) and (b), Income Tax Regs.

When a corporation does not formally declare a dividend, a distribution of property by a corporation may constitute a constructive dividend. Truesdell v. Commissioner, 89 T.C. 1280, 1295 (1987). Distributions are constructive dividends when a corporation provides a direct benefit to the taxpayer without an expectation of repayment. Neonatology Associates, P.A. v. Commissioner, 299 F.3d 221, 231-232 (3d Cir. 2002), affg. 115 T.C. 43 (2000); Hood v. Commissioner, 115 T.C. 172, 179 (2000) (quoting Magnon v. Commissioner, 73 T.C. 980, 993-994 (1980)); Truesdell v. Commissioner, supra. Although not every payment that has incidental benefit to the shareholder is considered a constructive dividend, a payment will constitute a constructive dividend when "'the distribution was primarily for the benefit of the shareholder.'" Hood v. Commissioner, supra at 179-180 (quoting Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1214 (5th Cir. 1978)).

In addition to distributions of property, shareholders may receive constructive dividends when they use corporate property for personal purposes. "[I]f shareholders of a corporation use corporate-owned property for personal purposes, they will be charged with additional distributions from the corporation, taxable to them as constructive dividend income if the corporation has sufficient earnings and profits." Melvin v. Commissioner, 88 T.C. 63, 79 (1987), affd. 894 F.2d 1072 (9th

Cir. 1990); see also Falsetti v. Commissioner, 85 T.C. 332, 356 (1985).

A.  Diverted Corporate Funds

Respondent argues that petitioner received and failed to report constructive dividends from the corporation of $149,747, $84,315, and $100,890 in 1988, 1989, and 1990, respectively. Respondent contends that petitioner obtained these constructive dividends by (1) diverting checks issued to the corporation for personal use, and (2) appropriating the proceeds from checks issued by the corporation for fictitious expenses.  Although petitioner admits to receiving these funds from the corporation, he argues that he used the funds to pay (1) the corporation's employees in cash, (2) the expenses of the horse racing business, and (3) the expenses of the beauty salon.

Petitioner has failed to provide documentation that supports his contention that the corporation maintained a large cash payroll.  To support his claim that the corporation paid a number of employees in cash, petitioner relies on the testimony of William McGugan, a construction superintendent.  While Mr. McGugan testified that he often picked up the payroll for employees who worked on his projects, he further testified that he did not know whether the payroll envelopes contained any cash.

Petitioner contends that he cannot substantiate the cash payroll because Ms. McNamara stole the corporation's books and

records. "Evidence of the theft of a taxpayer's records alone is insufficient to excuse substantiation." <u>Sumner v. Commissioner</u>, T.C. Memo. 1982-561. Further, we find the testimony of petitioner and his daughter relating to the cash payroll self-serving and unreliable. Petitioner offered no credible evidence to specify the number of employees who received cash compensation, the length of time that these employees worked for the corporation, or the hourly wage or salary that these employees received.

Petitioner concedes that the corporation failed to record into its books numerous checks that it received from its customers as payment for services. Mr. Agresto was not informed of the funds diverted from the corporation. When Mr. Agresto asked petitioner for a list of employees who received cash wages, petitioner refused. In the stipulated factual basis for plea relating to petitioner's criminal case, petitioner admitted that during each of the years in issue he and Ms. McNamara used the diverted corporate receipts for personal expenses. In that stipulation, petitioner also admitted that during each of the years in issue the proceeds of the fictitious corporate expense checks were used for personal expenses, including gambling and horse racing expenses. At his change of plea hearing, petitioner acknowledged that he had read the stipulation and stated that the stipulation was correct. We find that the evidence clearly and

convincingly demonstrates that petitioner appropriated for personal use the diverted corporate receipts and the proceeds from checks for fictitious expenses.

Petitioner also argues that some of the diverted funds were used to pay expenses related to the horse racing and beauty shop businesses. "[P]ayments made for the personal benefit of a shareholder by a corporation may constitute constructive dividends." Falsetti v. Commissioner, supra at 356. The parties stipulated that petitioner and Ms. McNamara owned these businesses as sole proprietors. These payments are of expenses for petitioner and Ms. McNamara's proprietorships, not corporate business expenses. Because the beauty shop and horse racing businesses were not corporate assets, any expenditure made in connection with these businesses did not benefit the corporation. See Truesdell v. Commissioner, supra at 1293-1294.

B. Use of Corporate Property

Respondent also determined that petitioner failed to report additional constructive dividends of $11,233 in 1988, $20,439 in 1989, and $8,060 in 1990, because "Moran General Constractors [sic] Inc. * * * permitted you to use corporate property for your personal use without compensation." On brief, petitioner failed to address this issue. Respondent argues that his determination should be sustained because petitioner failed to offer any evidence at trial relating to this issue.

We agree with respondent.  By failing to introduce any
evidence or argument to refute respondent's determination, we
find that petitioner has failed to prove that the determination
was incorrect.  Accordingly, we find that petitioner received
constructive dividends for personal use of corporate property.
See  Melvin v. Commissioner, 88 T.C. at 79; Falsetti v.
Commissioner, 85 T.C. at 356.

C.  Earnings and Profits

During the years in issue, the corporation reported on its
financial statement current net income after tax of $86,399 in
1988, $81,511 in 1989, ($15,244) in 1990, and ($3,673) in 1991.[5]
The corporation reported on its financial statements retained
earnings of $184,127 in 1988, $265,638 in 1989, $250,394 in 1990,
and $246,765 in 1991.  To determine petitioner's constructive
dividends, the corporation's reported earnings and profits should
be increased by the amounts of gross receipts that were not
included in the corporation's income.  See DiLeo v. Commissioner,
96 T.C. at 888; see also Yellow Cab & Car Rental Co. v.
Commissioner, T.C. Memo. 1974-79.  After adjustments are made for
the amounts of gross receipts diverted from the corporation, the
corporation had sufficient earnings and profits to support our

_____

[5] The corporation's fiscal year ended on Sept. 30 for each
of the years in issue.  We have included the reported income and
retained earnings and profits for the corporation's 1991 year
because it includes October, November, and December of the 1990
calendar year.

finding that the distributions in issue were constructive dividends.  See DiLeo v. Commissioner, supra at 888.

We hold that respondent has proven by clear and convincing evidence that petitioner received constructive dividends from the numerous corporate receipts and fictitious checks that he diverted for personal use.

II.  Deductions

In the notice of deficiency, respondent disallowed some of the deductions petitioner claimed.  Petitioner contends that he and Ms. McNamara paid the expenses claimed on their Federal income tax returns during the years in issue.

Section 162(a) allows a deduction for all "ordinary and necessary expenses paid or incurred" to carry out a trade or business in the taxable year.  Section 162(a)(1) specifically provides for "a reasonable allowance for salaries or other compensation for personal services actually rendered".  Taxpayers must maintain records that verify the amounts of deductions claimed on their returns.  Sec. 6001; Baratelle v. Commissioner, T.C. Memo. 2000-359.  Taxpayers bear the burden of proving that the amounts disallowed by the Commissioner constitute allowable deductions.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

A.  Beauty Shop Business Expenses

Respondent contends that petitioner is not entitled to deduct business expenses of $11,500 in 1989 and $16,000 in 1990 relating to the beauty shop.  Respondent argues that petitioner and Ms. McNamara improperly deducted amounts payable to "Clairol" as business expenses and deposited these amounts into their personal joint checking account.  Petitioner argues that he is entitled to deduct these expenses because they were paid to reimburse the renovation costs of the beauty shop.

We find that the checks made payable to "Clairol" that were issued by the beauty shop are not deductible business expenses. Petitioner requested that these checks be made payable to "Clairol" to disguise the payments as costs of goods used in the beauty shop.  Petitioner admits that these funds were deposited into his and Ms. McNamara's personal joint checking account.  The deposits into petitioner's personal account and the deceptive use of "Clairol" as the payee establish that these payments were not ordinary and necessary business expenses but veiled payments to petitioner.  Had these payments been legitimate business expenditures, petitioner would have had no need to create this elaborate scheme involving a bogus payee.

B.  Beauty Shop Salaries

Respondent argues that petitioner failed to substantiate wage expenses attributable to the beauty shop of $3,210 in 1989

and $14,951 in 1990.[6]  Petitioner contends that he is entitled to these deductions under section 162(a).

Petitioner failed to introduce any documentary evidence to support these claimed deductions.  Because petitioner has failed to substantiate these amounts and we are not convinced that he actually paid any of the disallowed wage expenses, we find that petitioner is not entitled to deductions for wages of $3,210 for 1989 and $14,951 for 1990.

C.  Beauty Shop and Horse Racing Activities

Petitioner claims that he is entitled to additional deductions for unreported business expenses paid in the beauty shop and the horse racing businesses during the years in issue. Respondent contends that petitioner has failed to substantiate the amounts of additional business expenses.

Petitioner offered no credible evidence for computing additional beauty shop and horse racing expenses paid in the years in issue.  In support of these additional deductions, petitioner offered into evidence a handwritten schedule that he prepared, apparently for purposes of this trial, which lists the horse trainer costs.  Petitioner was not a credible witness.  He

_____

[6] On their 1989 and 1990 Federal income tax returns, petitioner and Ms. McNamara claimed deductions of $86,580 and $90,101, respectively, as beauty salon wages.  In the notice of deficiency, respondent disallowed only portions of the deductions for which petitioner and Ms. McNamara failed to provide substantiation.

has an established pattern of falsifying documents.  Because petitioner failed to introduce any credible evidence, we find that he is not entitled to the additional deductions he claimed.

    D.  Section 167 Deductions

    On Schedules C, Profit or Loss From Business, petitioner and Ms. McNamara claimed depreciation deductions of $3,270 in 1989 and $2,003 in 1990.  In the notice of deficiency, respondent disallowed $3,097 in 1989 and $1,658 in 1990 of the claimed deductions.  Petitioner contends that he is entitled to these depreciation deductions; however, petitioner failed to produce evidence to support his contention.  We sustain respondent's determination with respect to the disallowed deductions.

III.  Fraud

    In the notice of deficiency, respondent determined that petitioner is liable for an addition to tax for fraud pursuant section 6653(b)(1) in 1988 and for penalties for fraud under section 6663 in 1989 and 1990.  With respect to fraud, the Commissioner bears the burden of proving by clear and convincing evidence that (1) the taxpayer has an underpayment of tax in each taxable year, and (2) at least some portion of the underpayment is attributable to fraud.  Sec. 7454(a); Rule 142(b).  If the Commissioner establishes that any portion of the underpayment of tax is attributable to fraud, the entire underpayment is treated as attributable to fraud, except for any portion of the

underpayment which the taxpayer establishes is not attributable to fraud.  Secs. 6653(b)(2), 6663(b).

A.  Underpayment

The Commissioner has the burden of proving by clear and convincing evidence that an underpayment exists in each of the years in issue.  The Commissioner is not required to prove the exact amount of the underpayment.  DiLeo v. Commissioner, 96 T.C. at 873.  On the other hand, the Commissioner does not satisfy his burden of proof by merely relying on the taxpayer's failure to prove error in the determination.  Id.  On the basis of the evidence presented and our analysis supra, we find that respondent has clearly and convincingly established that petitioner had underpayments of tax in 1988, 1989, and 1990.

B.  Underpayment Due to Fraud

Fraud has been defined as an "intentional wrongdoing on the part of a taxpayer motivated by a specific purpose to evade a tax known or believed to be owing."  Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); see also Langworthy v. Commissioner, T.C. Memo. 1998-218.  Courts consider a taxpayer's entire course of conduct in determining fraudulent intent.  DiLeo v. Commissioner, supra at 874; Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989).  Because direct evidence is rarely available, fraud may be proven by circumstantial evidence.  DiLeo v.

Commissioner, supra at 847; Chase v. Commissioner, T.C. Memo. 2004-142.

Courts have found that badges or indicia of fraud provide probative evidence. Badges of fraud include: (1) Consistent and substantial understatement of income; (2) failure to cooperate with authorities; (3) implausible or inconsistent explanations of behavior; (4) failure to maintain adequate books and records; (5) concealment of assets; (6) concealing income and information from a return preparer; and (7) extensive dealings in cash. E.g., Spies v. United States, 317 U.S. 492, 499 (1943); Estate of Mazzoni v. Commissioner, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memo. 1970-37; DiLeo v. Commissioner, supra at 875; Chase v. Commissioner, supra; Bacon v. Commissioner, T.C. Memo. 2000-257, affd. without published opinion 275 F.3d 33 (3d Cir. 2001).

Petitioner understated substantial amounts of his income in each of the years in issue. Petitioner falsely stated to respondent's agents that he was unaware that checks issued to the corporation had been deposited to his and Ms. McNamara's personal bank account.

Petitioner failed to maintain adequate corporate books and falsified corporate records. Numerous customer checks were not recorded on the corporation's books and records. Petitioner caused the corporation to issue checks to pay fictitious expenses and recorded these fictitious expenses in the corporation's

books.  To make these expenses appear legitimate, petitioner, or a family member at his direction, altered the canceled checks and created false invoices.

Petitioner concealed assets.  Petitioner devised a scheme whereby he or another employee of the corporation (1) deposited checks issued to the corporation into petitioner's personal bank account, or (2) cashed these checks and gave the proceeds to petitioner or Ms. McNamara.  Petitioner attempted to conceal these assets by failing to:  (1) Record the proceeds in the corporation's books; (2) inform Mr. Agresto that the corporation received these funds; and (3) report these amounts on the corporation's Federal income tax returns and his joint Federal income tax returns.

Petitioner also concealed the fact that beauty shop checks were deposited in his personal joint checking account. Petitioner directed Mr. Kapusta to issue checks drawn on the beauty shop account and to make them payable to "Clairol". Petitioner attempted to conceal the receipt of these checks by creating the appearance that these funds were spent on deductible business supplies.

Petitioner failed to inform his return preparer, Mr. Agresto, that petitioner had diverted corporate funds for personal use.  Mr. Agresto specifically asked petitioner and Ms. McNamara how, on the basis of their income, they could sustain

the significant horse racing losses.  Petitioner falsely explained to Mr. Agresto that he "had a very good job" before the years in question.

Finally, petitioner was convicted of aiding the filing of false tax returns for himself and Ms. McNamara for the years of 1989 and 1990.  In pleading guilty to these charges, petitioner admitted to diverting corporate funds and using those funds for personal purposes in 1988 through 1990.

We find that respondent has clearly and convincingly proven that substantial portions of petitioner's underpayments of tax are the result of fraudulently diverted corporate receipts, fictitious corporate expenses, and fraudulently deducted alleged expenses of his beauty shop operation.[7]

IV.  Section 6651(a)(1)--Failure To Timely File

Section 6651(a)(1) provides for an addition to tax when a taxpayer fails to file a timely return.  Section 6651(a)(1) provides an exception to the addition to tax when the failure to file a timely return "is due to reasonable cause and not due to willful neglect".

Petitioner and Ms. McNamara filed their 1989 joint Federal income tax return on September 14, 1990.  There is no evidence in the record that they requested an extension of time to file their

---

[7] Petitioner has not argued or established that any portions of the underpayments due to other adjustments were not due to fraud.  Secs. 6653(b)(2), 6663(b).

return.  Petitioner failed to argue that the failure was the result of reasonable cause.  Because the 1989 return was 5 months late under section 6651(a)(1), we find that petitioner is liable for an addition to tax equal to 25 percent of the amount required to be shown on the return in 1989, as determined by respondent.

V.  Section 6661--Substantial Understatement

Section 6661(a), as in effect for 1988, provides that "If there is a substantial understatement of income tax for any taxable year, there shall be added to the tax an amount equal to 25 percent of the amount of any underpayment attributable to such understatement."  There is a substantial understatement of income tax if the amount of the understatement exceeds the greater of (1) 10 percent of the tax required to be shown on the return for the taxable year or (2) $5,000.  Sec. 6661(b)(1)(A).  An "understatement" means the excess of the amount of tax required to be shown on the return for the taxable year over the amount of tax that is shown on the return.  Sec. 6661(b)(2)(A).  The amount of the understatement shall be reduced by any item adequately disclosed on the return or supported by substantial authority.  Sec. 6661(b)(2)(B).  The taxpayer bears the burden of proving that the Commissioner erred in imposing the addition to tax under section 6661(b).  Rule 142(a); Hamilton v. Commissioner, T.C. Memo. 2004-66.

We sustain respondent's determination that petitioner understated his income tax by $47,881 in 1988. Petitioner offered no evidence showing that any item contributing to the amount understated was supported by substantial authority or adequately disclosed on the return. See sec. 6661(b)(2)(B). Petitioner's understatement exceeds both 10 percent of the tax required to be shown on the return and $5,000. See sec. 6661(b)(1)(A). Petitioner is liable for an addition to tax under section 6661 in 1988.

## VI. Petitioner's Failure To Sign Returns

As a defense to the deficiencies, additions to tax, and penalties, petitioner argues that he did not sign the joint returns for the years in issue. A husband and wife who file a joint Federal income tax return are generally required to sign the return. Sec. 6013(a); sec. 1.6013-1(a)(2), Income Tax Regs. However, courts have found that spouses have filed a joint Federal income tax return even when one spouse failed to sign the return. Kann v. Commissioner, 210 F.2d 247, 251-252 (3d Cir. 1953), affg. 18 T.C. 1032 (1952); Heim v. Commissioner, 27 T.C. 270, 273 (1956), affd. 251 F.2d 44 (8th Cir. 1958). "The determinative factor is whether the spouses intended to file a joint return, their signatures being but indicative of such intent." Ladden v. Commissioner, 38 T.C. 530, 533 (1962) (citing

Stone v. Commissioner, 22 T.C. 893 (1954)); see also Ziegler v. Commissioner, T.C. Memo. 2003-282.

Here, the parties have stipulated that "With petitioner's permission, Bonnie E. McNamara signed petitioner's name on their joint income tax returns for the taxable years at issue." We find that petitioner manifested his intent to file joint Federal income tax returns by granting Ms. McNamara permission to sign his name on the returns in issue. Because petitioner and Ms. McNamara intended to file joint Federal income tax returns, we find that petitioner is liable for the deficiencies, additions to tax, and penalties. See sec. 6013(d)(3).

VII.  Period of Limitation

Section 6501(a) generally requires the Commissioner to assess any tax within 3 years after the return was filed. Section 6501(c) lists exceptions to the 3-year limitation on assessments under section 6501(a). In the case of false or fraudulent returns, section 6501(c)(1) provides that the tax may be assessed at any time. Because we find that petitioner's deficiencies in 1988, 1989, and 1990 were the result of fraud, the statute of limitations does not bar the assessment of tax for the years in issue.

To reflect the foregoing,

Decision will be entered

for respondent.

APPENDIX A

Checks Issued to Moran General Contractors, Inc., for Services
Rendered

The checks issued to Moran General Contractors, Inc., which petitioner diverted for personal use are as follows:

| Check No. | Payor | Amount Received | Date | Deposited/ Cashed[1] |
|---|---|---|---|---|
| 05122315 | E.I. DuPont de Nemours & Co. | $600.00 | 9/14/88 | Cashed |
| 05341940 | E.I. DuPont de Nemours & Co. | 5,961.75 | 12/8/88 | Deposited |
| 12965 | A.T. Chadwick Co. | 500.00 | 1/20/88 | Deposited |
| 6542 | Perri Elec. | 2,017.64 | 11/1/88 | Deposited |
| 65268 | Simpson Paper Co. | 1,724.50 | 4/1/88 | Deposited |
| 61279 | Gen. Chem. | 1,930.00 | 8/27/88 | Cashed |
| 62012 | Gen. Chem. | 450.00 | 9/24/88 | Cashed |
| 437404 | Allied Signal, Inc. | 3,331.50 | 1/25/88 | Cashed |
| 460258 | Allied Signal, Inc. | 2,420.00 | 3/6/88 | Cashed |
| 02051455 | Gen. Elec. Co. | 4,918.03 | 1/4/88 | Deposited |
| 044471 | Tarkett, Inc. | 1,650.00 | 5/4/88 | Deposited |
| 698 | Tarkett, Inc. | 1,715.00 | 6/15/88 | Cashed |
| 3028 | Tarkett, Inc. | 1,496.00 | 7/20/88 | Cashed |
| 02-099640 | James River Corp. | 1,500.00 | 1/28/88 | Cashed |
| 02-110178 | James River Corp. | 1,965.74 | 4/11/88 | Deposited |
| 02-113779 | James River Corp. | 658.40 | 5/3/88 | Deposited |
| 02-135979 | James River Corp. | 6,800.00 | 9/26/88 | Cashed |

[1] Deposited means that the proceeds from the check were deposited in petitioner and Ms. McNamara's joint personal checking account at Continental Bank.

| 141 53670 | City of Philadelphia | 3,300.00 | 2/11/88 | Deposited |
|---|---|---|---|---|
| 142 45316 | City of Philadelphia | 1,100.00 | 3/3/88 | Deposited |
| 142 48292 | City of Philadelphia | [2]4,313.96 | 3/14/88 | Deposited |
| 64771 | City of Philadelphia | 2,500.00 | 7/1/88 | Deposited |
| 141-93250 | City of Philadelphia | 2,480.00 | 12/6/88 | Deposited |
| 141-95221 | City of Philadelphia | 3,440.00 | 12/13/88 | Cashed |
| 4221918 | Harleysville Mut. Ins. Co. | 295.22 | [3]11/28/88 | Deposited |
| 386959 | Scott Paper Co. | 630.00 | [4]3/14/88 | Deposited |
| 394913 | Scott Paper Co. | 4,500.00 | 11/30/88 | Deposited |
| 395099 | Scott Paper Co. | 2,700.00 | 12/7/88 | Deposited |
| 67999791 | U.S. Treasury | 4,674.04 | 9/20/88 | Deposited |
| 67999792 | U.S. Treasury | 1,088.16 | 9/20/88 | Deposited |
| 67999790 | U.S. Treasury | 12.21 | 9/20/88 | Deposited |
| 05416277 | E.I. DuPont de Nemours & Co. | 2,950.00 | 1/9/89 | Cashed |
| 05512454 | E.I. DuPont de Nemours & Co. | 5,950.00 | 2/15/89 | Deposited |
| 019916 | A.T. Chadwick Co. | 3,952.00 | 5/30/89 | Deposited |
| 1939 | Sebastiani Sprinkler Design Inc. | 482.00 | 6/8/89 | Deposited |
| 325717 | Lukens, Inc. | 2,540.00 | 1/4/89 | Cashed |

---

[2] The parties stipulated that this check was issued in the amount of $4,313.36; however, the check itself states that it was issued for $4,313.96. We attribute this discrepancy to a typographical error, and we have listed the amount shown on the face of the check.

[3] The parties stipulated that this check was dated Nov. 22, 1988; however, the check itself is dated Nov. 28, 1988. We attribute this discrepancy to a typographical error, and we have listed the date shown on the face of the check.

[4] The parties stipulated that this check was dated Apr. 21, 1988; however, the check itself is dated Mar. 14, 1988. We attribute this discrepancy to a typographical error, and we have listed the date shown on the face of the check.

| | | | | |
|---|---|---|---|---|
| 40038340 | Phil. Gas Works | 1,158.50 | 2/22/89 | Deposited |
| 142 28887 | City of Philadelphia | 6,580.00 | 11/16/89 | Deposited |
| 142 29892 | City of Philadelphia | 1,340.00 | 11/20/89 | Deposited |
| 03842727 | Commonwealth of Pennsylvania | 531.54 | 1/3/89 | Deposited |
| 12019572 | U.S. Treasury | 236.50 | 2/21/89 | Deposited |
| 83294064 | U.S. Treasury | 153.04 | 5/23/89 | Deposited |
| 84843943 | U.S. Treasury | 9,624.00 | 7/25/89 | Deposited |
| 04960319 | E.I. DuPont de Nemours & Co. | 3,604.79 | 8/15/90 | Deposited |
| 03051496 | E.I. DuPont de Nemours & Co. | 1,500.00 | 9/20/90 | Deposited |
| 05079704 | E.I. DuPont de Nemours & Co. | 1,200.00 | 10/1/90 | Deposited |
| 05124747 | E.I. DuPont de Nemours & Co. | 1,970.00 | 10/18/90 | Deposited |
| 027195 | A.T. Chadwick Co. | 1,488.00 | 11/30/90 | Deposited |
| 024396 | A.T. Chadwick Co. | 10,000.00 | 5/3/90 | Deposited |
| 6469 | Nelson Co. | 2,312.00 | 9/13/90 | Deposited |
| 001859 | Medford Foods | 3,371.50 | 3/30/90 | Deposited |
| 004750 | Medford Foods | 2,534.40 | 8/10/90 | Deposited |
| 62365 | D & Z, Inc. | 3,770.00 | 10/29/90 | Deposited |
| 41614 | Tarkett, Inc. | 972.00 | 12/21/89 | Deposited |
| 142 58136 | City of Philadelphia | 6,875.00 | 7/12/90 | Deposited |
| 4589434 | Harleysville Mut. Ins. CO. | 1,605.00 | 6/14/90 | Deposited |
| 42447939186 | U.S. Postal Service | 109.90 | Aug. 1990 | Deposited |
| 01631 | PECO Energy | 1,069.70 | 11/21/90 | Deposited |
| 84439 | Phil. Hous. Auth. | 374.61 | 10/26/90 | Deposited |
| 84440 | Phil. Hous. Auth. | 376.00 | 10/26/90 | Deposited |
| 010838 | Sec. Elevator Co. | 5,740.00 | 11/9/90 | Deposited |
| 641917881 | U.S. Treasury | 209.91 | 9/11/90 | Deposited |
| 5959 | Roger E. Gibbons Ins. | 8,439.00 | 2/21/90 | Deposited |

APPENDIX B

Fictitious Expenses Paid By Moran General Contractors, Inc.

The checks drawn by Moran General Contractors, Inc., from its checking account that were issued to cover fictitious expenses are as follows:

| Check No. | Date | Amount | Purported Payee |
|---|---|---|---|
| 3425 | 11/5/88 | $1,225.00 | Wm. A. Schmidt |
| 3456 | 11/22/88 | 1,159.00 | Wm. A. Schmidt |
| 2867 | 4/11/88 | 3,959.00 | Ernest D. Menold |
| 2607 | 2/1/88 | 4,200.00 | Jim Black |
| 2774 | 3/15/88 | 2,100.00 | Jim Black |
| 3285 | 10/4/88 | 1,351.95 | Jim Black |
| 2960 | 5/23/88 | 4,600.00 | Giles J. Cannon |
| 2987 | 6/6/88 | 3,000.00 | Giles J. Cannon |
| 3117 | 8/15/88 | 1,200.00 | Giles J. Cannon |
| 3236 | 9/20/88 | 1,473.00 | Giles J. Cannon |
| 3393 | 11/7/88 | 1,188.00 | Giles J. Cannon |
| 2562 | 1/19/88 | 4,920.00 | Charles Dectis |
| 2946 | 5/16/88 | 3,600.00 | Charles Dectis |
| 2685 | [1]2/16/88 | 4,200.00 | Nicholas J. Bouras |
| 2935 | 5/9/88 | 3,100.00 | Nicholas J. Bouras |
| 2998 | 6/14/88 | 3,700.00 | D.J. Cappelli |
| 3021 | 6/27/88 | 1,100.00 | D.J. Cappelli |
| 3062 | 7/26/88 | 2,100.00 | D.J. Cappelli |
| 3111 | 8/9/88 | 1,335.00 | D.J. Cappelli |
| 3190 | 9/6/88 | 1,413.00 | D.J. Cappelli |

---

[1] The parties stipulated that this check was dated Aug. 15, 1988; however, the check itself is dated Feb. 16, 1988. We attribute this discrepancy to a typographical error, and we have listed the date shown on the face of the check.

| | | | |
|---|---|---|---|
| 3040 | 7/5/88 | 1,100.00 | Jack Cohen |
| 3135 | 8/22/88 | 1,300.00 | Jack Cohen |
| 3208 | 9/13/88 | 1,360.00 | Jack Cohen |
| 3377 | 10/25/88 | 1,111.00 | Jack Cohen |
| 3484 | 11/29/88 | 1,760.00 | Jack Cohen |
| 2461 | 1/4/88 | 4,000.00 | Ronald K. Hudecheck |
| 3258 | 9/27/88 | 1,611.00 | Frank Perri |
| 3391 | 10/31/88 | 1,209.00 | Frank Perri |
| 2650 | 2/8/88 | 4,500.00 | J.B. Acoust |
| 2893 | 4/20/88 | 4,100.00 | C.F. Remaley Design & Co. |
| 3169 | 7/19/88 | 3,000.00 | C.F. Remaley Design & Co. |
| 2929 | 5/2/88 | 3,100.00 | J. Azar |
| 4750 | 12/26/89 | 4,256.00 | H. Barron |
| 3677 | 1/24/89 | 600.00 | Jim Black |
| 3710 | 2/8/89 | 900.00 | Jim Black |
| 3801 | 2/28/89 | 1,375.00 | Jim Black |
| 4010 | 5/2/89 | 1,200.00 | Jim Black |
| 3597 | 1/3/89 | 1,527.00 | Charles Dectis |
| 3620 | 1/11/89 | 1,200.00 | Charles Dectis |
| 4044 | 5/18/89 | 2,500.00 | Charles Dectis |
| 4084 | 5/23/89 | 3,600.00 | Ronald Hudecheck |
| 3621 | Jan. 1989 | 2,320.00 | Frank Perri |
| 4105 | 5/30/89 | 2,990.00 | Frank Perri |
| 4140 | 6/13/89 | 2,500.00 | Frank Perri |
| 4153 | 6/20/89 | 2,300.00 | Frank Perri |
| 4286 | 8/8/89 | 1,100.00 | Frank Perri |
| 4306 | 8/16/89 | 600.00 | Frank Perri |
| 4318 | 8/21/89 | 2,800.00 | Frank Perri |
| 4346 | 8/28/89 | 3,000.00 | Frank Perri |

| | | | |
|---|---|---|---|
| 4379 | 9/5/89 | 4,000.00 | Frank Perri |
| 4405 | 9/13/89 | 600.00 | Frank Perri |
| 4424 | 9/18/89 | 3,375.00 | Frank Perri |
| 4465 | 9/27/89 | 1,300.00 | Frank Perri |
| 4480 | 10/3/89 | 1,500.00 | Frank Perri |
| 4549 | 10/18/89 | 3,274.45 | Frank Perri |
| 5233 | 6/27/90 | 1,950.00 | Guy C. Long |
| 5240 | 7/3/90 | 2,100.00 | Guy C. Long |
| 5247 | 7/11/90 | 1,650.00 | Guy C. Long |
| 5275 | 7/17/90 | 1,550.00 | Guy C. Long |
| 5371 | 8/7/90 | 3,000.00 | Guy C. Long |
| 5382 | 8/13/90 | 2,000.00 | Guy C. Long |
| 5477 | 10/1/90 | 2,000.00 | Guy C. Long |
| 5507 | 10/9/90 | 1,960.00 | Guy C. Long |
| 4795 | 1/16/90 | 3,640.60 | H. Barron |
| 4838 | 2/6/90 | 2,000.00 | Eugene Cobbs |
| 4875 | 2/27/90 | 3,000.00 | Eugene Cobbs |
| 4970 | 3/13/90 | 2,020.00 | Eugene Cobbs |
| 5222 | 6/20/90 | 1,335.74 | Eugene Cobbs |
| 5023 | 4/3/90 | 2,500.00 | J.H. Simon |
| 5054 | 4/16/90 | 2,911.46 | J.H. Simon |
| 5088 | May 1990 | 3,225.00 | J. Simon |
| 5142 | 5/24/90 | 2,125.00 | J. Simon |
| 5168 | 6/4/90 | 2,500.00 | J. Simon |
| 5179 | 6/12/90 | 1,900.00 | John Simon |