T.C. Memo. 2009-15

UNITED STATES TAX COURT

D'RE I. STERGIOS, f.k.a. D'RE I. MURRAY, Petitioner, AND
JAMES M. MURRAY, Intervenor v. COMMISSIONER OF
INTERNAL REVENUE, Respondent

Docket No. 8389-04.                    Filed January 22, 2009.

Curtis W. Berner, for petitioner.

James M. Murray, pro se

Davis G. Yee, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, Judge:  This case arises from a troubled five-year

marriage that produced two children, constant bickering, and

numerous mutual accusations of wrongdoing.  The Commissioner

issued each spouse a notice of deficiency for the last two full years of their marriage, and the former wife petitioned us. She doesn't contest the amount of the deficiency, but pleads as an affirmative defense that she qualifies as an innocent spouse. The Commissioner agrees with her, but her ex has intervened. In this case where neither of the main parties is credible, we piece together the fragments of truth as best we can to decide whether she is entitled to relief under section 6015.[1]

## FINDINGS OF FACT

This case arises from that couple's 2000 and 2001 tax returns, both of which greatly understated the tax due. The couple are James Murray and his former wife, D'Re Inge Stergios.[2]

Murray, an imposing man, had been a gifted swimmer in his youth. Stergios had been an athlete herself, a fine figure skater who might have competed in the Calgary Olympics. But injuries ended her career and she went on to college, graduating from the University of California at Davis with a degree in rhetoric and communications. Murray had graduated from the University of Arizona with a degree in economics and was working as a stockbroker at Merrill Lynch when he met his future former

---

[1] All section references are to the Internal Revenue Code and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] D'Re has taken her new husband's surname.

wife.  They began dating in 1995, soon married, and quickly had a child.  Stergios stopped working outside the home; their second child followed eighteen months later.  She earned no income of her own during the years at issue.

The marriage was troubled from the beginning, and the trouble began over money.  Murray did very well, but he moved from investment firm to investment firm, and with each move he received an upfront bonus that he was obliged to repay when he left.  He didn't, though, and by 1999 his $600,000 in unsecured debt forced him to declare bankruptcy.

These facts at least everyone agrees on.  But the former spouses' stories diverge on almost every other detail.  Stergios blames Murray's job-hopping on unethical trades that he made with her family's accounts.  Murray called one of his bosses, Francis Roche, to rebut her, but Roche instead testified that he asked Murray to leave because of improper handling of customer and personal accounts.  Roche we find to be credible, and his testimony is supported by persuasive documentary evidence that the New York Stock Exchange punished Murray for making trades on customers' accounts in violation of the Exchange's rules.

Stergios also claims that Murray routinely forged signatures.  As proof she provided the Appeals officer with contracts from three investment accounts opened in her name.  The signatures on the contracts are not her normal signature, and she

claims that Murray opened these accounts without her consent. Stergios also accused Murray of hiding money and a Porsche from the bankruptcy trustee by fraudulently putting them in his uncle's name.  Later, when Murray wanted a new Porsche, she claimed that he bought it by signing his father's name.

Murray's employment gave him considerable financial expertise, but he disputed any inference that Stergios didn't understand the family's financial affairs.  He claims that these were all authorized transactions.  He argues with special force that Stergios knew about the investment accounts in her name, offering as proof a $25,000 check deposited by Stergios into one of those accounts.  Stergios tells a lengthy story about how the check came to be deposited, but the specifics are not relevant. Murray also disputes Stergios's self-characterization as unwise in financial matters.  He testified at some length that Stergios's major at UC Davis--though it didn't require her to take any business or accounting classes--did require her to take a math class.[3]  After graduation, Stergios worked only as a secretary at her mother's construction company; or, perhaps, as a

_____

[3] Even this item of minor background detail produced contradictory testimony.  Stergios testified that she was not required to take a math class while at UC Davis.  We decline to take judicial notice, despite Murray's request, that a person graduating in 1990 from UC Davis with a degree in rhetoric/com-munications was required to take at least one math class.

vice president who gained a great deal of business acumen while working there.

These he-said, she-saids extended, however, to the more serious subject of spousal abuse. The first incident was in 1997 and seems to have begun with an argument while Stergios drove Murray home from work. The details differ depending on who is telling the story, but the incident ended when the police arrived after a neighbor called because she heard Stergios screaming on the couple's front porch. The police arrested Murray because Stergios accused him of pushing her. They released Murray a few hours later.

The second incident occurred in 1998 and began as an argument about Stergios's conversation with an electrical contractor who was installing a hot tub at their home. Stergios claims that she fled to a friend's house after Murray punched her twice. Murray called the police to report that she had stabbed him. The police were waiting when Stergios returned home, but she claimed that Murray had stabbed himself. She ended up spending the night in jail, though she was never charged.

The final incident occurred in December 2001. Murray had moved out of the couple's home, and allegedly taken some of Stergios's property with him. Stergios went to his apartment to retrieve it, only to have Murray allegedly throw a wicker ottoman

at her head and then start choking her.  The police were called, but she chose not to press charges.

The marriage ended in December 2002, but the arguments, allegations, and litigation continued.  One of the numerous lawsuits was a custody fight over the children.  The evidence of that dispute that the parties made a part of the record in this case confirm the picture of a marriage in conflict and disarray for its entire existence--filled with high levels of aggression, fighting, threats, and violence.  One part of that record, admitted under seal, leads us to find however that Stergios was not routinely in fear of Murray and often was verbally aggressive toward him.

The couple also disputes which of them handled the finances, and disputes with special vigor the question of who prepared their tax returns.  Murray says that Stergios paid the household expenses, monitored the couple's stock holdings, and prepared the returns.  Stergios claims that she merely paid household expenses from an account that Murray himself funded.  Stergios even goes so far as to claim that while they were married she never saw a bank or investment account statement or knew what stocks they held.  The truth, we find, is somewhere in between.

Most of the understatement at issue flows from unreported stock sales from Murray's accounts (and one of the accounts he allegedly opened in Stergios's name).  In 2000, there were 216

unreported stock sales totaling $9.6 million. In 2001, there were 244 totaling over $17 million. Murray testified that she knew practically every stock they owned, and would harp on the subject without mercy if he did not sell a stock before it went down. Stergios wouldn't admit to this conduct, but simply testified: "I assumed that since we were married we did own stock." We find neither of them credible--the only witness we believed on this subject was Tim Chan, a former friend of the couple. He testified that Stergios knew that Murray traded stocks and that he and Stergios would discuss the Murrays' net worth. We find that Stergios knew more then she admitted, but we cannot find that she knew about any particular stocks and accounts.

The other items causing the deficiencies are unreported income from sources other than stock sales, early withdrawals from Murray's retirement account, and disallowed business expense deductions. There was also an unsubstantiated charitable contribution to their children's school in 2000, deductions from a make-believe horse-training business that Stergios supposedly ran in 2000, an inflated deduction for mortgage interest in 2001, and a failure to include in their income State tax refunds received in both years.

Stergios claims to have no knowledge of any of these items, and apart from the stock sales, Murray presented no evidence or

argument to the contrary. We do know for sure that the couple's 2000 return was prepared electronically. By whom? There we again have conflicting evidence. Murray alleges that Stergios used Turbo-Tax to complete their return, with his role limited to providing her with a summary of his stock transactions.[4] Stergios claims that she never saw the return because it was Murray who prepared it, and he neither involved her in its preparation nor sought her signature before he filed it. The couple's other return at issue--for 2001--was at least filed on paper. But though the return bore Stergios's signature, she claims that she signed it under duress.

Stergios asks for relief from the liabilities arising from the understatements on both these returns. She first asked for relief by giving the relevant IRS forms to the revenue agent who was auditing the couple's 2000 and 2001 returns. Before the IRS acted on these requests, the Commissioner sent her a notice of deficiency for the 2000 and 2001 tax years. Stergios then petitioned us and claimed innocent-spouse relief as an affirmative defense to the deficiencies. Murray intervened. Before trial, the IRS reviewed Stergios's requests and decided

---

[4] The couple disagrees even on Stergios's computer competence. Stergios declared herself computer illiterate, while Murray told of her Turbo-Tax wizardry. Her exact level of computer aptitude is undoubtedly between these extremes, but is not essential to the outcome of this case except as further evidence that each ex's desire to harm the other undermines the credibility of both.

that she qualified for relief under section 6015(b), (c), and (f) for both years.  We tried the case in San Francisco, and Stergios was a California resident when she filed her petition.[5]

OPINION

Spouses who file joint returns are jointly and severally liable for the tax owed.  See sec. 6013(d)(3).  Section 6015 provides three ways out of this joint liability.  See sec. 6015(b), (c), (f).  These subsections address the same general problem but differ in important ways.  Relief under subsection (f) is available for a spouse who shows that "taking into account all the facts and circumstances, it is inequitable to hold [her] liable for any unpaid tax or any deficiency (or any portion of either)."  Relief under subsections (b) and (c), when raised as an affirmative defense, doesn't even require a determination by the Commissioner denying relief before this Court can grant it. Butler v. Commissioner, 114 T.C. 276, 288 (2000).  A requesting spouse under these subsections generally has the burden of proof, sec. 1.6015-3(d)(3), Income Tax Regs., but needs only to persuade us by a preponderance of the evidence.  See McClelland v. Commissioner, T.C. Memo. 2005-121.  Under subsection (b) we will relieve a spouse from liability if she persuades us that she was

---

[5] Appellate venue would thus be the Ninth Circuit.  See sec. 7482.  Appellate jurisdiction over an appeal by Murray, however, might be a problem.  See Baranowicz v. Commissioner, 432 F.3d 972, 976 (9th Cir. 2005), dismissing appeal from T.C. Memo. 2003-274.

justifiably ignorant of the understatement and that she meets the subsection's other requirements. For relief under subsection (c) a requesting spouse must persuade us that she meets the subsection's requirements, and we will deny relief if she doesn't or if the Commissioner persuades us that any one of the three exceptions for which he bears the burden of proof applies. See sec. 6015(c)(3)(A)(ii), (C), (d)(3)(C).

In routine subsection (c) cases, where the requesting spouse challenges the Commissioner's denial of relief, this allocation of the burden of proof sensibly places it on parties who are adverse to each other. But a problem arises in subsection (c) cases when the Commissioner favors relief, and the nonrequesting spouse intervenes to oppose it. See sec. 6015(e)(4); Rule 325; see also King v. Commissioner, 115 T.C. 118 (2000); Corson v. Commissioner, 114 T.C. 354, 363 (nonrequesting spouse's right to intervene the same in both stand-alone and affirmative-defense cases). In these cases the Commissioner isn't adverse to the petitioning spouse any longer, so--if the intervenor has intervened to oppose relief relying on any of the three exceptions listed above--there's a good chance that we would place the burden of proof on him to convince us that the requesting spouse is not entitled to relief. We don't need to decide that today, because both parties introduced evidence and

we can just decide the issues on who persuaded us by a preponderance of the evidence.

Stergios pleaded all three subsections of 6015, but we will focus on subsection (c). Section 6015(c) allows a requesting spouse to allocate the items giving rise to the deficiency to the nonrequesting spouse if:

> (1)  the spouses made a joint return;
>
> (2)  at the time the election was made the spouses were legally separated, divorced, or had not been members of the same household at any time during the previous 12 months;
>
> (3)  the election for relief was made after a deficiency was asserted but no later than two years after the Commissioner began collection activities; and
>
> (4)  the deficiency remains unpaid.

When a requesting spouse meets these four requirements, the items giving rise to the deficiency are allocated as if the spouses had filed separate returns. Sec. 6015(d)(3)(A).

The Commissioner (or, in this case, Murray) can also persuade us to deny relief with evidence that the requesting spouse had "actual knowledge, at the time the individual signed the return, of any item giving rise to a deficiency * * * which is not allocable to such individual." Sec. 6015(c)(3)(C); see also sec. 6015(c)(3)(A)(ii), (d)(3)(C) (explaining the other two exceptions that, if met, cause the requesting spouse to be denied relief).

No one disputes that Stergios meets requirements (1), (3), and (4). Murray does argue that she fails requirements (2) and that she had actual knowledge of what caused the deficiency for each year. His objection on requirement (2) is easily disposed of. Murray argues that relief under 6015(c) is not available because they had not been separated for twelve months when Stergios filed her Form 8857 Request for Innocent Spouse Relief. We are, however, not reviewing the Commissioner's determinations after Stergios filed the Form 8857. We are deciding whether Stergios has an innocent-spouse defense to her notice of deficiency. On May 21, 2004, when Stergios filed her petition with us, the couple was already divorced. See Vetrano v. Commissioner, 116 T.C. 272, 283 (2001). Murray's argument is thus beside the point, and we reject it.

And so we arrive at the first key issue in this case--Did Stergios know of any item giving rise to a deficiency when she signed the return?[6] Under section 6015(c)(3)(C), we look for "an actual and clear awareness (as opposed to reason to know) of the existence of an item which gives rise to the deficiency (or portion thereof)." Cheshire v. Commissioner, 115 T.C. 183, 195

---

[6] This part of the section 6015(c) analysis is complicated by Stergios's claims that she did not sign the 2000 tax return. But she does not claim this as a defense, so we will assume that the return was filed with her consent and will determine what she knew at the time the return was electronically filed. See sec. 6013(a); sec. 1.6013-1(a)(2), Income Tax Regs.; Moran v. Commissioner, T.C. Memo. 2005-66.

(2000), affd. 282 F.3d 326 (5th Cir. 2002).  Section 1.6015-3(c),

Income Tax Regs., specifically describes what a requesting spouse

must have knowledge of, given a specific class of item.

> **!** *If the item is omitted income.*  The spouse
> requesting relief must have knowledge of the
> income, which includes knowledge of the
> receipt of the income. Sec. 1.6015-
> 3(c)(2)(i)(A), Income Tax Regs.; <u>Kling v.
> Commissioner</u>, T.C. Memo. 2001-78. We do not
> infer actual knowledge from a mere reason to
> know of the omitted income.  Sec. 1.6015-
> 3(c)(2)(iii), Income Tax Regs.

> **!** *If the item is an erroneous deduction.*  The
> requesting spouse cannot allocate the item if
> she knew of the facts that made the item not
> allowable as a deduction.  Sec. 1.6015-
> 3(c)(2)(i)(B)(<u>1</u>), Income Tax Regs.

> **!** *If the item is a fictitious deduction.*  The
> requesting spouse cannot know that the
> expenditure was not incurred.  Sec. 1.6015-
> 3(c)(2)(i)(B)(<u>2</u>), Income Tax Regs.

With this background explained, we will look in turn at each

of the tax years at issue, always remembering that it is Murray

who bears the burden of proving that Stergios is not entitled to

relief because she knew too much.

A.   <u>2000</u>

We start with the 2000 tax return.  While the couple

disputes who prepared that return, Stergios and the Commissioner

agree that Murray completed the return and never showed it to

Stergios.  Murray denies preparing the return, but he admitted in

a declaration to the family court that he "prepared" the return.

When Stergios's attorney used the declaration to impeach Murray,

he replied that "prepare" meant that he reviewed the return after Stergios prepared it on his computer. The only evidence he offered was his own testimony. While we don't believe that Stergios is as ignorant about tax-return preparation as she would have us believe, we also don't believe that she is astute enough to calculate the couple's $527,717 short-term capital loss or create a fictitious business. We find that Murray completed the return and did so without showing it to Stergios.

Murray also tried to persuade us that Stergios knew about nearly all his stock transactions. While we are convinced that Stergios knew generally of the couple's stock holdings, the evidence does not suggest she knew enough to meet the "actual knowledge" requirement of section 6015(c)(3)(C). She would have had to have knowledge of the stock transactions that actually realized the omitted income, and Murray did not present any credible evidence that Stergios knew about any specific transaction. Stergios also lacks sufficient knowledge because we find that Murray hid the account statements, particularly the statements for accounts in her name. Therefore, we find that while Stergios did know that Murray was buying and selling stocks, she did not know that the activity produced omitted income.

The Commissioner proposed several other adjustments to the 2000 return, and we find each is attributable to Murray without Stergios's knowledge:

! More than $10,000 in wage income Murray received but did not report;

! More than $20,000 in premature IRA distributions he received from an account under his exclusive control;

! 1099-Misc income of $32,000 that Murray received and did not report;

! Numerous miscellaneous employee business expenses that Murray incurred but for which he had no substantiation--all relating to his own business as a stockbroker.

That leaves only the fictional horse-training business that generated close to $50,000 in losses during 2000. Stergios did train and ride horses as a hobby that year and into 2001, but we specifically find that she was unaware that a loss had been claimed for her hobby for the 2000 tax year.

B.   2001

We also find that Murray did not carry his burden of proof for the 2001 tax year. We do agree with him that Stergios cannot claim ignorance of the income omitted from the 2001 return. Stergios was asked at trial if she believed that the 2001 return reflected an understatement. She answered, perhaps strategically, that she never saw the tax return. She claims that after Murray had moved out, he appeared at the couple's former residence bearing the 2001 returns' (he had the State tax return,

too) signature pages. Stergios alleges that Murray demanded her signature and, when she refused, that he became agitated and physically threatened her until she signed.

But we find this was not the first time that Stergios saw the 2001 return. During the couple's custody battle, Murray prepared a "pro-forma" 2001 return for the family court. We find Stergios saw this pro forma return because it caused her to become so concerned Murray was underreporting his income that she called her lawyer.[7] Her attorney responded by sending a letter to Murray's attorney communicating her fears and stating that Stergios would not sign a joint return. The letter was dated February 27, 2002, just five days before Murray allegedly forced Stergios to sign the return. We found further evidence of her knowledge in a reply declaration that Stergios wrote to the family court. In the declaration she described in detail why the pro-forma return was incorrect. The description she gave suggests that the pro-forma return and the one she signed were the same. Thus, while it may be true that Stergios did not have knowledge of the understatement reflected on the return she actually signed, she did have actual knowledge that Murray was

_____

[7] Stergios had been monitoring deposits made to the couple's accounts, so she thought she knew how much income Murray had in 2001. As Murray points out, her estimates were not accurate because some of the money being deposited was not income but was money being moved between the accounts.

understating the tax owed.  So we don't believe her claim of ignorance.

That is not enough for Murray to win, though.  A return signed under duress is not a joint return, so only the individual who voluntarily signed the return is liable for the deficiency shown.  Sec. 1.6013-4(d), Income Tax Regs.  We find that a tax return was signed under duress if: (1) A spouse was unable to resist demands to sign the return; and (2) she would not have signed the return except for the constraint applied to her will.  Brown v. Commissioner, 51 T.C. 116, 119 (1968).  We must therefore look closely at the circumstances in which Stergios signed the 2001 return.

Murray claims that he never forced Stergios to sign it.  He claims that the couple was experiencing a period of reconciliation during the 2001 tax season and it was Stergios who prepared the return.  Murray's story is highly improbable because he admitted to preparing the 2001 pro-forma return.  For us to believe Murray's version of the facts, we must find that Stergios prepared a return exactly like the pro-forma return after her attorney sent Murray a letter insisting that she would not sign that same return.  We are not willing to make this leap.

Now we can apply the test for deciding whether Stergios signed under duress.  Stergios meets the first part of that test because she would not be expected to resist the threats of a man who is 6 feet 4 inches tall and weighs around 250 pounds,

especially given that the couple has a history of violence. Stergios also meets the second part because the letter to Murray shows she would not have signed the return if it were not for his threats. We therefore find it more likely than not that Stergios signed the 2001 return under duress. This makes only Murray liable for the deficiency.

We therefore hold that Stergios is not liable for the 2000 deficiency under section 6015(c) and she is not liable for the 2001 deficiency because she signed the return under duress.

<u>Decision will be entered for</u> <u>petitioner</u>.